2020 IL App (1st) 153629-B

FIRST DISTRICT
SIXTH DIVISION
August 7, 2020

No. 1-15-3629

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 7756 |
| | ) | |
| CHRISTOPHER PEREZ, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva concurred in the judgment and opinion.
Justice Pierce concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Defendant, Christopher Perez, was arrested by Chicago police on suspicion of first degree murder in the shooting death of Edgar Delgado. Defendant proceeded to trial where a jury convicted him of intentional first degree murder committed by personally discharging a firearm. Defendant filed a posttrial motion, which the trial court denied. The trial court sentenced defendant to 53 years in prison, including the 25-year firearm enhancement.

¶ 2    Defendant raises several issues on appeal. He contends that (1) the State failed to prove him guilty of first degree murder beyond a reasonable doubt, (2) the State improperly impeached its own witness, (3) his 53-year sentence violates the eighth amendment to the federal constitution and the proportionate penalties clause of the Illinois Constitution, (4) this court should exercise its

power under Illinois Supreme Court Rule 615(b)(4) to reduce his sentence, (5) his mittimus should be corrected to reflect the correct amount of presentence credit, and (6) his mittimus should be corrected to reflect only one conviction for first degree murder.

¶ 3    For the reasons stated below, we affirm defendant's conviction for intentional first degree murder, vacate his 53-year sentence, and remand for a new sentencing hearing.

¶ 4                                 I. JURISDICTION

¶ 5    In February 2015, a jury found defendant guilty of first degree murder for personally discharging a firearm causing Delgado's death. On September 24, 2015, the court sentenced defendant to 53 years in prison. Defendant's postsentencing motion was denied on October 15, 2015, and a notice of appeal was filed the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 6                                 II. BACKGROUND

¶ 7    Defendant was charged with six counts of first degree murder arising from the shooting death of Delgado on the streets of Chicago on February 18, 2012, when both defendant and Delgado were 17 years old. At trial, the State proceeded on two of the six murder counts. Both counts alleged that defendant caused Delgado's death by personally discharging a firearm during the offense, making him eligible for the mandatory 25-year sentencing enhancement.

¶ 8    The State's first witness was Bernardino Mercado. On February 18, 2012, he was walking near the intersection of Belmont Avenue and Monticello Avenue when his friend, David Cabrera, pulled up alongside and asked if he wanted a ride. Mercado entered Cabrera's car, and the pair proceeded north on Monticello Avenue. They eventually parked on Monticello Avenue, and after

being parked for about five minutes, Mercado noticed three cars. He thought they looked suspicious because they were driving bumper-to-bumper at about 10 to 15 miles per hour. The pair decided to follow in their vehicle. Traveling about 50 feet behind, Mercado saw the lead car turn onto Roscoe Street, then saw the second car hit someone on a bike. The bike rider flew into the air. At this point, Cabrera again parked the car on Monticello Avenue, this time south of the intersection with Roscoe Street. Mercado saw a person exit the second vehicle and begin chasing someone. Mercado believed the person being chased was the bike rider but admitted he could not be sure. The chase headed south on Monticello Avenue toward Mercado and Cabrera.

¶ 9    Mercado saw the person who had exited the second car raise his hand and fire three gunshots in the direction of the person fleeing south. Mercado testified he saw flames come out of the pursuer's hands. As both persons moved closer to them, Mercado was able to identify both. The fleeing person ran under a streetlight some 5 to 10 feet from Mercado, who observed that person to be Delgado, whom he knew from school. Mercado saw Delgado trip and fall. As Delgado was on the ground, the pursuer also came into the streetlight's illumination, and Mercado observed his face as well. Mercado testified that the pursuer was defendant, whom he knew from the neighborhood. He observed defendant's full face for what he claimed to be 30 seconds. He saw defendant with a silver handgun approach Delgado, fire one shot, and then flee back toward the intersection of Monticello Avenue and Roscoe Street, where he reentered the vehicle and left the scene.

¶ 10    Delgado got up and saw the pair. Mercado opened the back door of the vehicle and told Delgado to get in. Delgado told them he had been shot. Mercado and Cabrera drove Delgado to a hospital at the corner of Addison Street and Central Avenue. The pair obtained a nearby paramedic,

who with the assistance of another paramedic pulled Delgado from the car and took him into the hospital. Mercado and Cabrera then left the hospital because they did not want to be involved.

¶ 11    Mercado talked with the police about the incident on March 19, 2012. During this conversation, Mercado was presented with a group of photographs from which he identified defendant as the shooter. Mercado met with the police again on March 21, 2012, during which the officers asked him to view a lineup of several persons. Mercado again identified defendant as the person who shot Delgado. Mercado gave a statement to an assistant state's attorney as well. The statement mirrored the testimony he provided in court and again identified defendant as the shooter. During his testimony, Mercado was also presented with a picture of the intersection of Monticello Avenue and Roscoe Street looking south down Monticello Avenue. From that picture, Mercado identified the streetlamp where the shooting proximately took place. He also identified the bike in the photograph as the one he saw the night of the shooting.

¶ 12    On cross-examination, Mercado admitted he could not recall the colors of the cars. He never called 911 and did not tell anyone at the hospital he had witnessed a shooting. Mercado also explained that he talked with police on February 22, 2012, though he did not remember much of the conversation. When pressed by defense counsel about why he did not identify defendant as the shooter on February 22, Mercado admitted he "didn't know why." Mercado talked with Hector Martinez, who was with Delgado on the night of the shooting, and asked Martinez who was on the bike the night of the shooting. Martinez told Mercado that it was not Delgado on the bike but Martinez himself. Mercado admitted he saw a person on a bike get hit by a car and then moments later saw Delgado running toward him; because of this, he had assumed Delgado had been the person riding the bike. When pressed again about why he did not identify defendant on February 22, Mercado explained that the police never asked him.

¶ 13    Martinez testified he was Delgado's cousin and was with him the night of the shooting. He admitted he was being held in contempt of court because he had failed to respond to the subpoena to testify in this case. On the night of February 18, 2012, he and Delgado were walking toward Delgado's father's house so that Delgado could eat and shower. Martinez rode his blue mountain bike while Delgado walked alongside him. They were walking on Roscoe Street, and as they approached the intersection with Monticello Avenue, three cars pulled up on them. Martinez told Delgado to run, and Delgado began to run south on Monticello Avenue. Martinez then began riding his bike down Roscoe Street.[1]

¶ 14    As he was riding down Roscoe Street, Martinez was hit from behind by a minivan, causing him to fall to his knees. He turned around to see the driver and the passenger of the van. He could not identify the driver but testified that defendant was in the passenger seat. He recognized defendant because he had "seen him a couple of weeks ago before that." Martinez then began running down Roscoe Street. As he fled, he heard four or five gun shots. He turned his head to see four or five persons standing at the corner of Roscoe Street and Monticello Avenue, all wearing black hooded sweatshirts with the hood up. He could not identify any of them nor did he see a gun. He ran back to his home not far from the scene and tried to call Delgado but received no answer. A Chicago police detective came to his door later that night. Martinez described this conversation as short, and he was unable to recall the specifics of what was discussed. He then accompanied the detectives back to area headquarters where a longer conversation took place. During this conversation, he identified the three cars he saw before the shooting. He told the detectives the

---

[1] Roscoe Street is an east-west street; however, the record is unclear which direction Martinez rode "down."

first car was a green Blazer with a broken window, the second was the minivan that hit him, and the third car was a red two-door.

¶ 15 Martinez was interviewed again on February 23, 2012. He specifically denied seeing defendant on the corner of Roscoe Street and Monticello Avenue when the shooting occurred. He denied telling the detectives he witnessed defendant exit a vehicle. He also denied telling them that, as he was running from the scene, he observed defendant on the corner with three to four other Hispanic males. He did admit that he identified defendant from a photo array.

¶ 16 On cross-examination, Martinez stated it was only a matter of seconds between him getting knocked off his bike and when the shooting started. He identified the Blazer as the car he saw people exiting from prior to the shooting. He explained that his trial testimony was consistent with the statements he provided to the assistant state's attorney and the grand jury.

¶ 17 Cabrera testified that he was the driver with Mercado when the shooting happened. He confirmed many of the details of Mercado's testimony but never saw the shooter's face and could not identify him. While on Monticello Avenue, he saw a bike rider get hit by a car. He only saw one person exit from the middle car, and that person fired at the victim. Cabrera did not stay at the hospital because he did not want to be involved.

¶ 18 The State called several police officers and the physician who performed the autopsy of Delgado. Dr. Ariel Goldschmidt confirmed that Delgado died of two gunshots wounds to the back. He found no evidence of close-range firing around either wound, and he found that the entry and exit wounds were not at a significant angle from each other. Detective John Haniacek interviewed Martinez on February 23, 2012, during which Martinez identified defendant as one of the persons on the corner immediately prior to the shooting. However, he admitted that his reports do not state that Martinez identified defendant as the shooter.

¶ 19    At the close of the State's case, defendant moved for a directed verdict, which the court denied. Defendant did not testify and called no witnesses. Following deliberations, the jury found defendant guilty of the murder of Delgado and found that he personally discharged a firearm proximately causing death. Defendant filed an unsuccessful posttrial motion, in relevant part challenging the sufficiency of the evidence and claiming that the firearm enhancement violates the constitutional requirement of proportionate penalties.

¶ 20    The presentencing investigation report (PSI) indicated that defendant was born in July 1994, had no prior convictions or juvenile adjudications, was raised by his parents with no abuse or neglect, attended high school until his arrest for the instant offense, and was seeking his GED while in jail. Defendant admitted joining a gang in 2012 and maintained that "he stopped affiliating with the gang in 2013." Some of his friends were associated with gangs and crime while some were not. He met with a psychiatrist three times while in jail, and defendant stated that he had "trouble concentrating" and was depressed. He acknowledged regular but not excessive use of alcohol and marijuana.

¶ 21    At the sentencing hearing, neither party had any changes to the PSI, and the court stated that it had reviewed the PSI. The State presented victim-impact statements from victim Delgado's mother and sister. The State argued for a sentence above the statutory minimum of 45 years, noting that defendant had no prior convictions but arguing that he shot an unarmed and fleeing person in the back twice.

¶ 22    The defense presented the statement of defendant's mother that he was "a very respectful person with his elders *** who likes to help out and share when he can," giving examples of his help to family members, neighbors, and others. She noted that he was seeking his GED while in jail and stated that jail personnel described defendant as respectful. Noting her worry for defendant

in prison and that she may not be alive when he would be released from prison, she asked the court for "compassion and mercy."

¶ 23    Defense counsel argued that Delgado's death was a tragedy for Delgado's family but also for defendant's family because he "has barely begun his life" and was only 17 when the offense occurred. Counsel argued that:

> "the research has consistently shown that age is the most significant factor in predicting acts of criminality. And that people age out of committing crimes to a remarkably consistent extent, and that statistics show that unfortunately we have, perhaps, a 45 percent recidivist rate in an age group of young offenders to the age of perhaps in their 20s. And that plummets as offenders get older, and I think there is approximately a 3 percent age recidivist rate amongst offenders who are over 55 years of age."

Counsel argued that defendant "will be sentenced without regard to the individual before you," as he "led a brief but exemplary life" other than the instant offense and "has a loving and nurturing family," so that he "from all indications should have been a productive member of society." Counsel argued that the 45-year minimum sentence was "extraordinarily long," as he would not leave prison until age 62, and thus his life was "over," as he would not marry or have children or a career, so that compassion and mercy called for the minimum sentence.

¶ 24    Given the opportunity to address the court, defendant thanked the court and thanked his family for attending court and supporting him.

¶ 25    The court recited that defendant committed this offense at age 17, was in a gang, and had friends in gangs, remarking that "[t]his is where being in a gang brings you." The court agreed with the defense that this case was "a double tragedy" and "an utter waste," with "two kids who[se] adult life was about to begin," but remarked that "you make the decisions that you make" and that

defendant was not a child but not an adult either. The court recited that it reviewed the PSI and considered the arguments in light of the aggravating and mitigating factors under the law. Noting that defendant would be 70 years old upon release if he survived prison, the court sentenced him to 53 years' imprisonment.

¶ 26    Defendant timely filed a postsentencing motion, claiming that the court did not give due weight to the mitigating evidence and reiterating his proportionate penalties challenge to the firearm enhancement. The court denied the motion, and defendant timely filed a notice of appeal.

¶ 27                                III. ANALYSIS

¶ 28    In his first issue, defendant contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. He attacks Mercado's testimony as inconsistent, contradictory, and completely unreliable, and he asks us to reverse his conviction given Mercado's unreliable testimony and the lack of physical evidence tying defendant to the murder.

¶ 29    When a defendant argues that the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, the appellate court will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). While the trier of fact's findings regarding witness credibility are entitled to great weight, the determination is not conclusive. *Smith*, 185 Ill. 2d at 542. The fact that the factfinder accepted testimony as true does not guarantee that it was reasonable to do so. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, an appellate court will only reverse a conviction where no "rational tier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 185 Ill. 2d at 541.

¶ 30      In raising this argument, defendant asks us to reject the testimony of Mercado as unreliable and instead accept Martinez's testimony. Our supreme court has stated that the testimony of a single witness, if positive and credible, is sufficient to convict even if it is contradicted by the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Eyewitness testimony is insufficient "where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. A reviewing court will reverse a conviction based on eyewitness testimony when that testimony is "improbable, unconvincing or contrary to human experience." (Internal quotation marks omitted.) *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001).

¶ 31      After reviewing the testimony presented at trial, we do not find it unreasonable for the jury to rely on the testimony of Mercado. Defendant is correct that Mercado was impeached by omission (see *People v. Williams*, 329 Ill. App. 3d 846, 854 (2002)) in that he did not initially identify defendant as the shooter when first given an opportunity. However, impeachment is not evidence. *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47. Impeachment challenges the credibility of the witness, and the trier of fact will determine what weight to give it. *Id.* Mercado testified that he initially did not say anything because he did not want to get involved, the same reason given by Cabrera. When first approached by police, the police explained that people in the neighborhood were saying Mercado knew something. It would not be unreasonable for the jury to infer the reason that neither Mercado nor Cabrera wanted to be involved was fear of retribution if they named the shooter.

¶ 32    Despite defendant's insistence, we also do not find the jury's acceptance of Mercado's version of events over Martinez's to be unreasonable. Importantly, both Mercado and Martinez put defendant at the scene of the crime. While Mercado did not initially identify defendant, he did so on three subsequent occasions while under oath. Mercado identified defendant in a sworn statement to the assistant state's attorney, at the grand jury hearing, and several times at trial. Each time, Mercado stated that he saw Delgado run into the light of the streetlamp followed by defendant. Mercado knew defendant from the neighborhood, and he testified that he had a full face view of both defendant and Delgado. While Cabrera testified he could not identify the shooter, he corroborated Mercado's testimony that there was only one shooter.

¶ 33    While defendant holds Martinez out as the more credible of the two witnesses, photographs entered into evidence contradicted a key part of his testimony. Martinez testified that he told Delgado to run when they first noticed the cars, and Delgado took off south on Monticello Avenue while Martinez began to ride his bike "down" Roscoe Street. However, the photographs show Martinez's bike in the middle of the intersection of Roscoe Street and Monticello Avenue, not "down" Roscoe Street. The State also impeached Martinez with the testimony of Detective Haniacek that Martinez told him defendant was standing on the corner when the shooting took place. Thus, Martinez is not without his own credibility issues.

¶ 34    Defendant also argues that Mercado's testimony was contradicted by the photographic and forensic evidence, specifically his observations concerning the distance from the streetlight to the intersection and distance between the shooter and victim. Notably, the record does not contain pictures identifying either where Cabrera's car was located or where Delgado was shot the second time. Moreover, any alleged discrepancy between Mercado's testimony and the photographic and forensic evidence was for the trier of fact to resolve. *Williams*, 193 Ill. 2d at 338 (finder of fact

weighs and resolves conflicts in the evidence). We also reject defendant's attempt to utilize Google Maps to relitigate the issue on appeal. Neither the photographic nor forensic evidence rendered Mercado's testimony improbable or contrary to human experience.

¶ 35    Defendant's reliance on *People v. Shaw*, 2015 IL App (1st) 123157, is misplaced. In *Shaw*, this court reversed a robbery conviction that had been based solely on the complaining witness's testimony. *Id.* ¶¶ 15, 30, 32. In reversing the conviction, this court found that the sole witness's account of events was contradicted by the surveillance video and police testimony. *Id.* ¶ 26 (surveillance video seriously calls into question witness's encounter with defendant). These impeachments rendered the testimony incredible and, therefore, unreliable. *Id.*

¶ 36    We do not find Mercado's testimony improbable or contrary to human experience. Both Mercado and Martinez placed defendant at the scene of the crime. While Mercado did not identify defendant as the shooter initially, he did identify him three subsequent times, including at trial. Martinez testified defendant was present in the minivan but not on the corner where the shots were fired. It was therefore up to the trier of fact to resolve the inconsistencies in their testimony and reach a conclusion. Given all the other testimony and evidence produced at trial, we do not find the jury's conclusion to believe the testimony of Mercado to be unreasonable.

¶ 37    Defendant next contends that the State improperly impeached Martinez without showing he had affirmatively damaged its case. He testified at trial that he saw defendant in the minivan only and denied that defendant could have been on the corner of Monticello Avenue and Roscoe Street when the shooting happened. The State impeached his testimony by examining him regarding certain prior inconsistent statements related to defendant's location at the scene and by presenting those prior inconsistent statements through Detective Haniacek's testimony.

¶ 38    "The credibility of a witness may be attacked by any party, including the party calling the witness." Ill. S. Ct. R. 238(a) (eff. Apr. 11, 2001). A prior inconsistent statement can be admitted for impeachment purposes only if the trial testimony of the witness does "affirmative damage" to the calling party's case. *People v. Cruz*, 162 Ill. 2d 314, 361 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). "It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982)). Affirmatively damaging testimony is testimony that is not merely disappointing but that gives " 'positive aid' " to the other side. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47.

¶ 39    After reviewing Martinez's testimony, we find that the State properly impeached him. While defendant argues that "at no point did Martinez ever identify the shooter or ever claim to know the guilt or innocence of Perez," we disagree. The State's theory of the case was that defendant shot Delgado, first while chasing him south down Monticello Avenue and then under a streetlamp further south on Monticello Avenue, based on Mercado's testimony. Martinez testified that defendant hit him with a minivan and then, seconds later, he saw a group of persons shooting south down Monticello Avenue. He testified there would have been no time for defendant to hit him with the van and make it to the corner to shoot at Delgado. Accordingly, Martinez's testimony was that defendant could not and did not shoot Delgado. Such testimony completely contradicts the State's argument that defendant was the shooter. Thus, Martinez's testimony was affirmatively damaging to the State's case, and the State could impeach him with his prior inconsistent statement that defendant was on the corner when the shooting happened.

¶ 40    Defendant also challenges his 53-year sentence, contending that it constitutes a *de facto* life sentence, shocks the conscience in light of his personal circumstances, and was imposed

without consideration of his youth in violation of the eighth amendment to the federal constitution and the proportionate penalties clause of Illinois's constitution.

¶ 41    The sentencing range for defendant's offense of first degree murder committed by personally discharging a firearm was 45 years to life including the firearm enhancement. 730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2012).

¶ 42    In *Miller v. Alabama*, 567 U.S. 460 (2012), the United States Supreme Court held that a sentence of natural life imprisonment or life without parole imposed mandatorily upon a person who was a minor at the time of his or her homicide offense violates the eighth amendment because mitigating factors relating to youth could not be considered in imposing the sentence. In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court held that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." In *People v. Reyes*, 2016 IL 119271, ¶ 9 (*per curiam*), our supreme court held that a "mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole." The State conceded in *Reyes* that the juvenile defendant would not live long enough to become eligible for release in 89 years, as his sentence provided, when he would be 105 years old. *Id.* ¶ 10. The *Reyes* court determined that the sentence amounted to a "*de facto* life-without-parole sentence" so that the *Miller* mitigating factors had to be considered before its imposition. *Id.*

¶ 43    In *People v. Buffer*, 2019 IL 122327, ¶¶ 30-33, our supreme court noted that various decisions by this court had reached different conclusions as to what constitutes a *de facto* life sentence. Looking to legislation implementing *Miller* as illustrative of the legislature's intent or policy, the *Buffer* court determined that a prison sentence of 40 years or less is not a *de facto* life

sentence. *Id.* ¶¶ 34-41. The *Buffer* "defendant committed an offense, at age 16, that subjected him to a legislatively mandated minimum sentence of 45 years and for which he received a sentence of 50 years. Because defendant's sentence was greater than 40 years, we conclude that defendant received a *de facto* life sentence." *Id.* ¶ 42.

¶ 44    Here, we must follow *Buffer* and determine that defendant's 53-year sentence for first degree murder committed when he was 17 years old is a *de facto* life sentence.[2] What remains is for us to determine whether the trial court "failed to consider defendant's youth and its attendant characteristics in imposing that sentence." *Id.*

¶ 45    Our supreme court has held that *Miller* mandates that a trial court consider the defendant's youth and related characteristics as mitigating circumstances before imposing a life sentence. *Holman*, 2017 IL 120655, ¶ 37 (citing *Miller*, 567 U.S. at 483, 489). A minor defendant "may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. While express findings of incorrigibility are not required, "a trial court must consider some variant of the *Miller* factors before imposing a life sentence without the possibility of parole." *Id.* ¶ 43. Those factors include, but are not limited to:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence
>
> of his particular immaturity, impetuosity, and failure to appreciate risks and consequences;
>
> (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's

---

[2] We issued an opinion in this case in 2018, before our supreme court clarified in *Buffer* what constitutes a *de facto* life sentence. In a supervisory order, the supreme court has directed us to vacate our judgment and reconsider in light of *Buffer*. *People v. Perez*, No. 123504 (Ill. Mar. 25, 2020) (supervisory order). We have already vacated our judgment and are now issuing an opinion pursuant to our supreme court's direction.

degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

Our inquiry into the *Miller* factors is strictly retrospective: "the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case." *Id.* ¶ 47.

¶ 46 Here, the trial court was well aware of defendant's age at the time of the offense and had evidence at sentencing of his supportive family and home environment. There was trial evidence that defendant was the lone shooter but also that other persons participated in the events surrounding the offense. Notably, there was no evidence or argument at sentencing, beyond mention of defendant's gang affiliation, addressing familial or peer pressure. There was no evidence or discussion at sentencing regarding defendant's competence or ability to cooperate with counsel. Lastly, while defense counsel argued defendant's age as it relates to rehabilitative potential or recidivism, the court's sentencing remarks focused on defendant's responsibility for his action with no reference to rehabilitative potential. While the court was silent on whether defendant was incorrigible or beyond rehabilitation, it imposed a sentence well in excess of the statutory-minimum 45 years that by itself is a *de facto* life sentence under *Buffer*. In sum, after reviewing the sentencing proceedings, we cannot conclude that the trial court conducted the analysis or applied the factors required by *Miller* and *Holman*. We must therefore vacate defendant's sentence and remand for resentencing in compliance with *Miller*, *Holman*, and *Buffer*. As we are remanding, we need not address defendant's other challenges to his sentence.

¶ 47    Finally, defendant asks us to correct his mittimus. As issued, it shows convictions for both knowing first degree murder and intentional first degree murder. The State correctly concedes, pursuant to *People v. Alvarez-Garcia*, 395 Ill. App. 3d 719, 734 (2009), that the lesser included offense should merge into the greater offense. Defendant also contends that he is entitled to additional presentence credit, and the State agrees that he is entitled to 1283 days of credit rather than the 919 days originally stated on the mittimus. On remand, the mittimus should therefore reflect (1) a single count of conviction, for intentional first degree murder, and (2) a total presentence credit of 1283 days.

¶ 48                                IV. CONCLUSION

¶ 49    For the foregoing reasons, we affirm defendant's conviction for intentional first degree murder. We vacate his 53-year sentence and remand for resentencing consistent with *Miller*, *Holman*, and *Buffer*.

¶ 50    Affirmed in part, vacated in part, and remanded with directions.


¶ 51    JUSTICE PIERCE, dissenting:

¶ 52    I concur in the judgment affirming defendant's conviction. However, I respectfully dissent from that part of the judgment that orders a new sentencing hearing. While there is no longer any question that a sentence of greater than 40 years for a juvenile defendant is a *de facto* life sentence (*People v. Buffer*, 2019 IL 122327, ¶ 41), the imposition of such a sentence on a juvenile defendant does not automatically result in a new sentencing hearing (*People v. Holman*, 2017 IL 120655).

¶ 53    In my judgment, a plain reading of the sentencing proceedings in this case clearly shows that the trial court considered defendant's youth and characteristics related to his young age before imposing the 53-year sentence. If we look to the five factors *Holman* instructs reviewing courts to

consider, it is undisputed that, as the majority acknowledges, the court was obviously aware of defendant's age at the time of the offense ("(1) the juvenile defendant's chronological age at the time of the offense" (*Holman*, 2017 IL 120655, ¶ 46)), his "supportive family and home environment" (*supra* ¶ 46) ("(2) the juvenile defendant's family and home environment" (*Holman*, 2017 IL 120655, ¶ 46)), and that defense counsel "argued defendant's age as it relates to rehabilitative potential or recidivism" (*supra* ¶ 46) ("(5) the juvenile defendant's prospects for rehabilitation" (*Holman*, 2017 IL 120655, ¶ 46)). The trial court was equally aware of defendant's gang affiliation, that defendant was the lone shooter and sole perpetrator of this murder, and "that other persons participated in the events surrounding the offense" (*supra* ¶ 46) ("(3) the juvenile defendant's degree of participation in the homicide" (*Holman*, 2017 IL 120655, ¶ 46)).

¶ 54    It appears that the majority is persuaded by the absence of any mention of "familial or peer pressure," the absence of "evidence or discussion at sentencing regarding defendant's competence or ability to cooperate with counsel," as well as the fact that "defense counsel argued defendant's age as it relates to rehabilitative potential or recidivism, [but] the court's sentencing remarks focused on defendant's responsibility for his action with no reference to rehabilitative potential" (*supra* ¶ 46). These omissions alone are not a valid basis for resentencing.

¶ 55    First, the record reflects that defendant was zealously represented. Defense counsel admirably fought for his client and, arguably, avoided a sentence that could have been substantially greater. But there is only so much one can do. Can anyone seriously question whether evidence of "familial or peer pressure" existed and, if it did, that counsel would not have brought it to the court's attention? Can anyone seriously question that counsel would not have informed the court of defendant's competency or inability to cooperate with counsel had that been the case? I can confidently state that defendant's sentencing hearing was conducted so that any available

mitigating evidence that existed would have been presented. Defendant received the benefit of any doubt that would have favorably affected the penalty he faced.

¶ 56    The majority acknowledges that under *Holman* "express findings of incorrigibility are not required" (*supra* ¶ 45), yet it takes issue with the trial court's failure to reference defendant's rehabilitative potential. But there is no requirement for the trial court to recite magic words or to make specific reference to specific categories of youthful characteristics especially where there is no indication that a unique or specific youthful trait pertains to the defendant. And while the majority's finding that a 53-year sentence is "well in excess of the statutory-minimum 45 years" (*supra* ¶ 46) is debatable, given the facts of this murder, a longer term would easily fall within the discretionary range available to the sentencing judge. In fact, the close to minimum sentence defendant received is a strong indication that the court did not view defendant as a permanent incorrigible. There has been no showing that defendant was deprived of any opportunity to make his case for a sentence different than the sentence originally imposed.

¶ 57    I respectfully dissent.

---

**No. 1-15-3629**

---

| | |
|---|---|
| **Cite as:** | *People v. Perez*, 2020 IL App (1st) 153629-B |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-7756; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Drew A. Wallenstein, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |

---