2020 IL App (1st) 171739
No. 1-17-1739
Opinion filed September 30, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No 95 CR 6668 (01) |
| | ) | |
| MARTIN HILL, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Dennis J. Porter, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker and Justice Griffin concurred in the judgment and opinion.

**OPINION**

¶1 After a jury found Martin Hill guilty of two counts of first degree murder and one count of attempted first degree murder—offenses he committed at age 15—the trial court sentenced Hill to a mandatory term of life in prison to run consecutively with a 30-year sentence for the attempt. We affirmed the trial court's judgment on direct appeal. *People v. Hill*, No. 1-98-2383 (2001) (unpublished order under Illinois Supreme Court Rule 23). Hill filed a postconviction petition raising several claims, including a challenge to his life sentence as unconstitutional. The parties agreed that Hill's mandatory life sentence violates the principles set out in *Miller v. Alabama*, 567

U.S. 460 (2012), which holds that mandatory life without parole for a juvenile defies the eighth amendment's ban on cruel and unusual punishment. *Id.* at 465. The court resentenced Hill to two concurrent terms of 54 years for first degree murder to run consecutively with a 6-year sentence for attempt, which Hill contends still violates *Miller* and its progeny.

¶2 Under *Miller*, courts may impose life sentences only on "the rare juvenile offender whose crime reflects irreparable corruption." *Miller*, 567 U.S. at 479-80; *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016) ("crimes reflect permanent incorrigibility"). Here, as the State concedes, the circuit court did not find Hill as permanently incorrigible, instead it acknowledged his rehabilitation potential.

¶3 During oral argument, the State conceded Hill's sentence would be unconstitutional if indeed a *de facto* life sentence. But, the State argues, because of Hill's eligibility for day-for-day good behavior credit potentially permitting his release after 30 years in prison, he did not receive a *de facto* life sentence. We disagree. Despite his eligibility for day-for-day sentencing credit, the Department of Corrections has discretion over the revocation of good time credit. *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 19. The 30 year minimum assumes Hill's future behavior in prison will be pristine, a product of mere speculation that cannot masquerade as fact. Hill's 60 year sentence still exceeds 40 years and, so, remains a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42 ("greater than 40 years" equals a *de facto* life sentence for juvenile offender).

¶4 We exercise our authority under Illinois Supreme Court Rule 615 (eff. Jan. 1, 1967) and impose concurrent 34-year sentences for each count of first degree murder to run consecutively with a 6-year sentence for attempt. This sentence accounts for the grave seriousness of Hill's

2

offenses and the circuit court's express findings that he has rehabilitative potential. Hill's new sentence—40 years in total—represents the maximum sentence short of a *de facto* life term.

¶5                                      Background

¶6      In 1998, Hill was convicted of two counts of first degree murder and one count of attempted murder relating to a shooting on December 29, 1994. At the time, Hill was 15-years old.

¶7      Hill told authorities that, before the offense, he was out walking when a car approached. The driver was Leon Jones, Tommy Wilson sat in the front passenger seat, and McKinzie Ranson sat in the back passenger seat. Wilson, 18 years old, instructed Hill to get in the back seat, and Hill complied, claiming he sat behind Jones on the driver side. A few minutes later, Jones pulled the car alongside the victims' car, and Wilson and Ranson shot at the car. Hill told authorities that Wilson and Ranson were the shooters.

¶8      At Hill's trial, two eyewitnesses identified Hill as the front seat passenger and Ranson as sitting in the back on the passenger side. They saw shots coming out of the car from both the front and back passenger side. Notwithstanding the conflicting testimony, the jury convicted Hill as a shooter.

¶9      The trial court originally sentenced Hill to two concurrent terms of mandatory life in prison without parole for each of two counts of first degree murder, with a consecutive term of 30 years in prison for the attempt.

¶10      This court affirmed Hill's convictions on direct appeal. In 2001, Hill filed a *pro se* petition for postconviction relief. While it was pending, the United States Supreme Court decided *Miller*, 567 U.S. 460. Based on *Miller* and *People v. Davis*, 2014 IL 115595, which held that *Miller* applied retroactively on postconviction review, the parties agreed that Hill should be resentenced. Hill's counsel, the State, and the circuit court believed resentencing must precede resolving other

3

postconviction claims. Although all agreed that Hill's underlying sentence should be vacated, absent from the record is an order—written or oral—formally granting postconviction relief or vacating the original sentence.

¶11    The circuit court held a new sentencing hearing. The parties agreed, based on the law at the time of the offenses, that the sentencing range for each murder was 20 to 60 years, to run concurrently, and the sentencing range for the attempted murder was 6 to 30 years, to run consecutively to the murder sentences.

¶12    During Hill's resentencing hearing, Dr. Mark Cunningham testified as an expert of clinical psychology and forensic psychology. Dr. Cunningham reviewed Hill's records and conducted interviews with Hill and his family members. He testified on general psychological trends and risk factors in teens and how those factors applied to Hill. Dr. Cunningham concluded that Hill had a variety of psychological and behavioral issues that would have affected his decision-making ability.

¶13    Dr. Cunningham explained that teens are less capable than adults of mature judgments and experience a higher propensity for engaging in risky and illegal behaviors. Similarly, teens have trouble self-regulating and controlling their impulses; thus, they are more susceptible to negative external influences. Given their desire for approval and fear of rejection, teens succumb to peer pressure even without direct coercion are far more likely than adults to commit crimes in a group context or where the presence of peers is a motivating factor. Not only does the brain of teens not operate the same way as in an adult brain, but this immaturity lessens the level of their moral culpability.

¶14    Neurodevelopmental factors could reduce a teen's functional maturity. The neurodevelopmental factors that reduced Hill's functional maturity relative to other 15-year-olds

4

included fetal cigarette exposure, his mother's weight loss while pregnant with him, ADHD type symptoms, anoxic experiences where the brain was deprived of oxygen, and a history of head injury. Dr. Cunningham believed that Hill, though he did not have an ADHD diagnosis, displayed symptoms on the ADHD continuum, including inability to focus, being hyper, and impulsivity.

¶15 Dr. Cunningham noted Hill had a history of traumatic experiences, including physical abuse by his mother from belt whippings that left enduring welts, a climate of hostility between his parents, significant recurrent exposure to prostitution, exposure to community violence, and sexual abuse by women 5 to 15 years older. Hill, at age 12, also witnessed the gruesome death of a peer, who was crushed by an elevator in Hill's building. Hill lived in a housing project characterized by heavy gang activity, pervasive drug dealing, and drug abuse. Eighty percent of male teens in the housing project engaged in felony level criminal activity. Hill personally observed numerous acts of violence, including multiple shootings. Abused and maltreated youth, like Hill, often show immediate and long-term psychological, emotional, and physical effects including insufficient capacity for emotional self-regulation, drug or alcohol problems, and violent or criminal behavior.

¶16 Hill had many risk factors, which effect Dr. Cunningham considered catastrophically cumulative. Dr. Cunningham concluded (i) Hill's participation in the offense reflected a 15 year old's brain immaturity, including poor judgment, faulty values, and empathy deficits; (ii) the impulsivity and co-participation characterizing Hill's involvement fit the brain immaturity of a 15 year old; (iii) particular neurodevelopmental factors reduced Hill's functional maturity relative to other 15 year olds; (iv) Hill's functional maturity at the time of the offense was negatively impacted by traumatic experiences; (v) Hill's daily marijuana use further compromised his functional maturity; (vi) Hill lacked sufficient maturity, perspective, and ego strength to resist the pervasive

influence of his violent and corrupt community; and (vii) family dysfunction and distress limited the ability of Hill's parents and relatives to constructively parent him or mitigate the effects of the surrounding community.

¶17    On cross-examination, Dr. Cunningham acknowledged that Hill was not predestined to commit murder based on his adverse developmental experiences, although he was highly inclined for a criminally violent outcome. Dr. Cunningham allowed that the co-occurrence of youthfulness and adverse developmental experiences may not invariably result in a criminally violent outcome, though it does significantly increase its likelihood.

¶18    Dr. Cunningham also testified that Hill's risk of recidivism as lower than the average parolee, finding that he has a greater likelihood of successful reintegration. To support this, Dr. Cunningham pointed to Hill's lack of prior adult arrest record, lack of prior prison sentences, the long time he had served in prison, his recent prison disciplinary record showing no serious infractions, family support, housing support from St. Leonard's House, and employment prospects. Also, Hill's conduct as an immature 15 year old was not predictive of his risk of offending as an adult—decisions made with an immature brain are not predictive of long-term criminality in the same way decisions might be if made by an adult with a fully developed brain.

¶19    Hill's behavior while incarcerated also indicated significant gains in psycho-social maturity and efforts toward rehabilitation. Two corrections officers testified at the resentencing hearing about their interactions with Hill while incarcerated, calling him a model inmate. Hill's prison records indicate a number of jobs that required the trust of officers.

¶20    Though the court did not believe Hill's criminal conduct inevitable, it did consider it unsurprising given Hill's background. The court also noted it could be reasonably argued that the

older offenders pressured Hill to participate. The court described the 15-year-old Hill as a "dangerous monster" but addressed his significant improvement in conduct while in jail, stating:

"…the crime you committed was a terrible, terrible crime. It was an ambush just like the State characterized it against people who are just completely defenseless. It was a serious, serious, serious crime and seriously you have answered for it.

And then what have you been since up to this point? Well, you have been in a structured environment. But I must say to your credit, you've handled yourself pretty well I have to say. Your record in the penitentiary is I would say close to exemplary, at least as good as anyone else's that I've ever seen that has been in that long quite frankly. And you have some people that have put up a shoulder for you from the jail over there, how you have conducted yourself in jail. You've made significant improvement. So I think it would be fair to remove the monster head from you at this point quite frankly.

What you will become, that's a little harder to predict. But I would note that it doesn't seem to be any significant gang activity in your background during your part in the department of corrections.

* * *

I think a significant reduction of your sentence is warranted quite frankly. It still has to be a significant sentence based upon the gravity of what you did. I would point out I cannot ignore the fact that you were one of the shooters in this, and your degree of participation was as high as it could be, that being one of the shooters.

7

Though, having considered—the other thing I might add about the law, I read *Miller* to say that anything that makes it a mandatory life sentence on a juvenile isn't going to cut it. And, therefore, that would include any mandatory life sentence, it would include any mandatory consecutive sentence."

The court did not find Hill permanently incorrigible. In resentencing, after noting that Hill's sentence warranted a significant reduction, the circuit court nevertheless focused on the seriousness of the crime and Hill's role as a shooter. The court resentenced Hill to concurrent terms of 54 years in prison for each murder count, and a consecutive term of 6 years for the attempt count. The circuit court denied Hill's motion to reconsider sentence, and Hill appealed to this court. Hill still has other pending postconviction claims unrelated to *Miller*.

¶21                                    Jurisdiction

¶22     First, we must confront an odd jurisdictional wrinkle neither party addressed in their briefs. Arguably, the circuit court lacked jurisdiction to enter the new sentences because we cannot find an order—oral or written—formally granting postconviction relief and vacating the original sentences. Without an order, we lack jurisdiction save for the authority to vacate the circuit court's void judgment. *People v. Bailey*, 2014 IL 115459, ¶ 29.

¶23     It is well-settled that proceedings on postconviction petitions "[are] not part of the criminal process" but rather collateral civil proceedings. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). This means the filing of a postconviction petition does not continue the underlying criminal case; the circuit court loses jurisdiction over the criminal case 30 days after the entry of its final judgment. *People v. Lake*, 2020 IL App (1st) 170309, ¶ 14. Here, the circuit court entered its final judgment on May 12, 1998, and the record does not reveal any proceedings on a timely filed motion to reconsider sentence. As a result, the circuit court lost jurisdiction over the underlying

8

criminal case on June 12, 1998. Only by granting postconviction relief and entering an appropriate order can the circuit court reacquire jurisdiction over the criminal case. See 725 ILCS 5/122-6 (West 2018) ("If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and any such supplementary orders *** as may be necessary and proper.").

¶24    In their briefs, Hill and the State assert that the circuit court vacated Hill's original sentences and ordered a new sentencing hearing based on a claim under *Miller*, 567 U.S. 460, that Hill raised in his postconviction petition. We have examined the portions of the record cited by both parties. No order vacating the sentences exists. Hill cites to the State's sentencing memorandum which says, "On November 16, 2015, th[e circuit] court signed an order granting [Hill's] petition and vacating [his] sentence of life without parole." But the November 16, 2015, order says, "Defendant remanded to CCDOC. No Bail. B/A 12-15-15." Likewise, the report of proceedings contains no oral order vacating Hill's sentence. This discussion took place before Judge Joyce, substituting for Judge Porter, on November 16, 2015:

> "THE COURT: I can appreciate what you say when you mean *Miller v. Alabama* and everything else, but has the sentence actually formally been vacated? And are you asking me to do that now because I suppose I really ought to do that and then perhaps set no bail and remand him to Cook County Jail. Otherwise the jail might just send him back to IDOC if they think he has an IDOC sentence.
>
> COUNSEL: I think to be safe entering an order vacating the sentence would be appropriate. That has been our understanding with Judge Porter is that the sentence if it had not been vacated, would be vacated.

9

THE COURT: So I'll say defendant remanded to Cook County—Is that what the State believes ought to happen, remand him to Cook County Jail?

STATE: Yes, Judge.

\* \* \*

THE COURT: By agreement 12-15-15, remanded to the Cook County Jail, held pursuant to no bail."

Once the case made it back to Judge Porter, still there is no order vacating Hill's underlying life sentence. The only other mention of vacatur appears in the proceedings on January 24, 2017:

"COUNSEL: [Mr. Hill] still doesn't understand why we're doing the sentencing part first, the *Miller* part before the post conviction. And he said—He asked if Your Honor could explain to him why this is happening. We talked about it, but he wants to hear it from you.

\* \* \*

THE COURT: Because you can't have a post conviction without a sentence. You don't have a judgement. I can't do the post conviction without a sentence. Okay."

The court and the parties operated on the mistaken belief that Hill's sentence had been vacated.

¶25    Thus, under the terms of the Post-Conviction Hearing Act, the circuit court lacked jurisdiction to resentence Hill—the circuit court neither granted postconviction relief nor entered "an appropriate order with respect to the judgment or sentence in the former proceedings." 725 ILCS 5/122-6 (West 2018).

¶26    Nevertheless, the revestment doctrine applies, as the State contended at oral argument. The revestment doctrine allows a court to reassert jurisdiction over a matter where jurisdiction has

otherwise been lost. *People v. Kaeding*, 98 Ill. 2d 237, 240 (1983). For the doctrine to apply, both parties must (i) actively participate in the proceedings, (ii) fail to object to the untimeliness of the late filing, and (iii) assert positions that make the proceedings inconsistent with the merits of the prior judgment. *Bailey*, 2014 IL 115459, ¶ 25.

¶27    Both parties actively participated in the resentencing proceedings. Both Hill and the State filed resentencing memoranda, both Hill and the State called live witnesses at the sentencing hearing, and both Hill and the State made arguments to the circuit court for what they believed was an appropriate new sentence. Resentencing took place 19 years after the original sentence, yet, the State did not object to the untimeliness of Hill's attack on his sentence. See *People v. Buffkin*, 2016 IL App (2d) 140792, ¶ 13 ("State has failed to object to the untimeliness of defendant's attack on his sentence ***."). Finally, although Hill and the State acknowledged that a discretionary life sentence was still available to the circuit court, both parties agreed that a mandatory life sentence was off the table. Those positions conflict with the merits of the original judgment, which imposed a statutorily mandated life sentence.

¶28    Because the circuit court had revested jurisdiction, we also have jurisdiction and can now proceed to the merits.

¶29    We offer a final note of guidance to the circuit court. Counsel for one of Hill's co-defendants described the postconviction proceedings as being in "an unusual posture." The circuit court agreed and expressed concern about "what happens when you have [an] unusual [posture] and you couple that with postconvictions," comparing it to getting "mired into the swamp." We think this jurisdictional swampiness could have been avoided by keeping the claims in the postconviction petition together.

11

¶30     As reflected in the record excerpts, the parties and the court seemed to think resentencing Hill had to precede considering his other claims for postconviction relief. In our view, this was backwards. Many of the claims in Hill's postconviction petition, if successful, would have granted him a new trial. In his amended petition, counsel raised a claim of actual innocence. Success on any of these claims would have mooted the sentencing issue by vacating the entire underlying judgment. Because Hill's sentence was only voidable, not void (see *id.* ¶ 6 (citing *People v. Castleberry*, 2015 IL 116916)), the circuit court could have deferred Hill's *Miller* claim. The posture need not have been "unusual."

¶31                                  Analysis

¶32     The parties' briefs raise two disputes: (i) whether Hill's new 60-year sentence is a *de facto* life sentence given his eligibility for day-for-day sentence credit and (ii) whether Hill's new 60-year sentence comported with our supreme court's constitutional requirements for juvenile sentencing found in *People v. Holman*, 2017 IL 120655. At oral argument, the State conceded that should Hill's sentence constitute a life sentence it is unconstitutional because the trial court concluded that Hill had rehabilitative potential and never found him permanently incorrigible. We appreciate the State's candor.

¶33                  Effect of Eligibility for Day-for-Day Credit

¶34     Our primary task, in light of the State's concession, is whether to follow the line of cases finding statutory sentence credit irrelevant to determining whether a sentence constitutes a life sentence. See *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 19, *People v. Daniel*, 2020 IL App (1st) 172267, ¶ 26, and *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 22; but see *People v. Evans*, 2017 IL App (1st) 143562, ¶ 14 (applying day-for-day credit to determine whether

12

defendant's sentence constituted life term). We concur with the reasoning in *Peacock* and the cases relying on it. Hill's sentence constitutes a *de facto* life sentence.

¶35 Our supreme court has determined that sentences greater than 40 years embody *de facto* life sentences, while "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence." *Buffer*, 2019 IL 122327, ¶ 41.

¶36 In *Peacock*, the defendant's 80-year sentence subject to day-for-day good behavior credit constituted a *de facto* life sentence. *Peacock*, 2019 IL App (1st) 170308, ¶ 19. The court emphasized that the Department of Corrections, not the court, had discretion in awarding and revoking good time credit, and "the trial court has no control over the manner in which a defendant's good conduct credit is earned or lost." *Id.* The court held that Peacock was not sentenced to 40 years but 80 years in prison, even though his inmate status report indicated that his projected release from prison would be after serving slightly less than 40 years. *Id.* ¶ 20. The uncertainty of the actual date of release, subject to the Department of Correction's discretion, pushed the court to hold day-for-day credit could not be considered in a sentence determination.

¶37 The court in *Peacock* amply supported its conclusion that "day-for-day credit is not guaranteed" with decisions from this court and our supreme court. *Id.* ¶¶ 19-20 (collecting cases). We add that *Peacock*'s interpretation adheres to the supreme court's analysis in *Buffer*. The language in *Buffer* focuses on the sentence "imposed" not the sentence served. *Buffer*, 2019 IL 122327, ¶ 41. The court also considered, and rejected, the State's statistical approach to the "survivability" of a sentence. *Id.* ¶¶ 30-34. In other words, the court declined to focus its analysis on the potential release date. *Id.* ¶¶ 33-34. Instead, the court repeatedly emphasized its reliance on sentencing judgments reached by the legislature as the entity "better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id.* ¶ 35.

13

¶38    In line with *Buffer*'s rejection of an offender's release date as the benchmark and its focus on legislative judgments, we turn to what the General Assembly has to say about sentencing credit. Under current law, offenders convicted of first degree murder receive no sentence credit. 730 ILCS 5/3-6-3(a)(2)(ii) (West 2018). The law in effect at the time of Hill's offense, however, allowed day-for-day credit against every sentence except a natural life sentence. 730 ILCS 5/3-6-3(a)(2) (West 1994). Under the Unified Code of Corrections then in effect, the General Assembly expressly granted the Department of Corrections authority to "prescribe rules and regulations for revoking good conduct credit." *Id.* § 3-6-3(c). The maximum amount of credit that could be revoked for any one infraction was one year and the only limit on revocation of credit was that revocation of an amount in excess of 30 days in a 12-month period had to be approved by the Prisoner Review Board. *Id.* § 3-6-3(c). The provision for revoking sentence credit remains largely unchanged in the current Unified Code of Corrections. See 730 ILCS 5/3-6-3(c) (West 2018).

¶39    The Department of Corrections followed the General Assembly's instructions to promulgate regulations governing the revocation of sentence credit. Any offender found guilty of "misconduct or violating departmental rules" can have good time credit—including day-for-day credit—revoked. 20 Ill. Adm. Code 107.150(a) (2019). For revocations of fewer than 30 days, the director has discretion. For revocations greater than 30 days the director must submit his or her recommendation to the Prisoner Review Board for approval. 20 Ill. Adm. Code 107.150(b), (c) (2019). The Department of Corrections has a list of infractions that can result in discipline. 20 Ill. Adm. Code 504.Appendix A (2017). Each infraction carries a maximum possible revocation of credit ranging from one month to one year. 20 Ill. Adm. Code 504.Table A (2017) (table reproduced in Appendix to this opinion (*infra* ¶ 55)).

14

¶40     Credit in the amount of fewer than 30 days can be restored at the discretion of the director; if the director wishes to restore more than 30 days credit, he or she must submit a recommendation to the Prisoner Review Board. 20 Ill. Adm. Code 107.160(c) (2019). The director considers a host of factors in determining whether to restore lost credit. 20 Ill. Adm. Code 107.160(b)(1)-(8) (2019). An offender may not petition for restoration of credit more than once in any three-month period. 20 Ill. Adm. Code 107.160(d) (2019).

¶41     The Department of Corrections' regulations, promulgated at the express instruction of the General Assembly, confirm the rationale of *Peacock*: "the trial court has no control over the manner in which a defendant's good conduct credit is earned or lost." *Peacock*, 2019 IL App (1st) 170308, ¶ 19. Statutory day-for-day credit provides nothing more than a baseline, and the baseline can be altered by the General Assembly's express grant of discretionary authority to the Department of Corrections. Given *Buffer*'s instruction that we look to the legislature and the legislature's grant of wide-ranging discretion to the Department of Corrections, cases like *Evans* do not survive *Buffer*. We find *Peacock* and the cases relying on it persuasive and will not consider Hill's eligibility for day-for-day credit in determining whether his sentence was a *de facto* life sentence.

¶42                           No Finding of Permanent Incorrigibility

¶43     While the State concedes that this sentence was unconstitutional, we are not bound by party concessions (*e.g.*, *People v. Carter*, 2015 IL 117709, ¶ 22), so we will explain our agreement with the parties.

¶44     *Miller* barred mandatory sentences of life without parole for juveniles under the age of 18 at the time of the crime. 567 U.S. at 465. *Montgomery*, 577 U.S. ___, 136 S. Ct. at 734, held that *Miller* applied retroactively. In *Holman*, our supreme court extended *Miller* protection to

discretionary sentences of life without parole. 2017 IL 120655, ¶ 40. Under *Miller* and its progeny, to sentence a juvenile defendant to a life sentence, or a *de facto* life sentence, a court must take into account a juvenile defendant's age and its hallmark features and consider the possibility of the defendant's rehabilitation. *Miller*, 567 U.S. at 477-79. Only juvenile defendants whose crimes reflect permanent incorrigibility, a rarity, deserve life without parole. *Montgomery*, 577 U.S. \_\_\_, 136 S. Ct. at 734; *Holman*, 2017 IL 120655, ¶ 46.

¶45    To find permanent incorrigibility, a court must assess the defendant's youth and its attendant characteristics, including:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree or participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶46    Mere awareness of a defendant's youth does not establish that the court specifically considered youth and its attendant characteristics when determining a sentence. See *Harvey*, 2019 IL App (1st) 153581, ¶ 13. For a life sentence or *de facto* life sentence, the court must find permanent incorrigibility and show evidence that it specifically weighed the *Miller* factors as laid out in *Holman*, 2017 IL 120655, ¶ 46. See *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 31 (though trial court stated that it considered *Miller* factors, it did not make finding of permanent incorrigibility).

16

¶47 At Hill's resentencing hearing, the court summarized Dr. Cunningham's lengthy testimony by focusing primarily on a small portion of cross-examination and emphasizing that Hill's conduct was not inevitable, even if it was "not surprising." The court expressed no finding of permanent incorrigibility and Dr. Cunningham's undisputed testimony—which the court apparently found credible—overwhelmingly conflicted with permanent incorrigibility.

¶48 Dr. Cunningham presented ample evidence of Hill's particular immaturity, impetuosity, and failure to appreciate risks and consequences. Fifteen-year-olds already have a level of brain immaturity that contributes to impulsivity and poor judgment, and Hill had less functional maturity relative to others his age due to neurodevelopmental issues, traumatic experiences, physical abuse, and daily marijuana use. Hill's upbringing in a violent and dysfunctional home environment also played a role in his likelihood to engage in impulsive criminal activity; he was exposed to drug and gang activity, sexual abuse, and hostility between his parents.

¶49 The court, though ultimately finding Hill voluntarily participated in the shooting and his participation was as active as it could be, also believed that it was a reasonable argument that the older offenders pressured Hill to participate. This follows Dr. Cunningham's testimony of the greater susceptibility of teens to external influences and to peer pressure, even without direct coercion. The court also credited Dr. Cunningham's testimony on Hill's prospects for rehabilitation, finding Hill's behavior while incarcerated indicated he had "made significant improvement" in maturity and towards rehabilitation, The court initially described Hill as a "monster" but later said, "it would be fair to remove the monster head from you at this point quite frankly."

¶50 Despite the substantial testimony indicating Hill's high susceptibility to making criminally violent choices, the court instead emphasized Dr. Cunningham's cross-examination, where Dr.

Cunningham allowed that Hill was not predestined to commit a crime. In addition, the court expressed grave concerns with the seriousness of Hill's offenses. But, as the State concedes, the court's sentence does not comport with the constitutional principles expressed in *Holman*. Although the court need not recite "magic words" (see *People v. Perez*, 2020 IL App (1st) 153629-B, ¶ 45), almost every finding it made rejects the conclusion that Hill is one of the rarest of juvenile offenders who deserve a *de facto* life sentence.

¶51    We find Hill's *de facto* life sentence violates the eighth amendment ban on excessive punishment as interpreted by our supreme court in *Holman*.

¶52                                    Resentencing

¶53    The usual remedy would be remanding the matter for a new sentencing hearing. See, *e.g.*, *Peacock*, 2019 IL App (1st) 170308, ¶ 25. But, in the interest of judicial economy and because we have adequate evidence of the court's findings, we exercise our authority under Rule 615(b)(4) to reduce Hill's sentence to comply with *Buffer*. Following the circuit court's emphasis on the seriousness of Hill's crime, and accounting for the court's acknowledgment that Hill has rehabilitative potential rather than being permanently incorrigible, we sentence Hill to the maximum term of years possible without imposing a *de facto* life sentence. We vacate Hill's 60-year sentence and impose a 34-year sentence for each count of first degree murder, to run concurrently, and we impose a 6-year sentence for the attempt, to run consecutively. Hill's sentence, totaling 40 years, no longer constitutes a *de facto* life sentence.

¶54    Affirmed as modified.

Section 504. TABLE A Maximum Penalties (20 Ill. Adm. Code 504.Table A (2017))

| Offense | Maximum Penalties for Offenders | | | |
|---|---|---|---|---|
| | Loss or Restriction of Privileges | B or C Grade | Sentence Credit Revocation | Segregation |
| 100. Violent Assault of any Person | 1 year | 1 year | 1 year | Indeterminate |
| 101. Arson | 1 year | 1 year | 1 year | 6 months |
| 102a. Assault with Injury | 1 year | 1 year | 1 year | 1 year |
| 102b. Assault | 1 year | 1 year | 6 months | 3 months |
| 102c. Assault of an Offender | 6 months | 6 months | 6 months | 3 months |
| 103. Bribery & Extortion | 1 year | 1 year | 1 year | 6 months |
| 104. Dangerous Contraband | 1 year | 1 year | 1 year | 1 year |
| 105. Dangerous Disturbance | 1 year | 1 year | 1 year | 6 months |
| 106. Escape or Runaway | 1 year | 1 year | 1 year | 1 year |
| 107. Sexual Misconduct | 6 months | 6 months | 6 months | 6 months |
| 108. Sexual Assault | 1 year | 1 year | 1 year | Indeterminate |
| 109. Electronic Contraband | 1 year | 1 year | 1 year | 6 months |
| 110. Impeding or Interfering with an Investigation | 3 months | 3 months | 3 months | 3 months |
| 111. Security Threat Group or Unauthorized Organizational Leadership Activity | 1 year | 1 year | 1 year | 1 year |
| 201. Concealment of Identity | 6 months | 6 months | 6 months | 3 months |
| 202. Damage or Misuse of Property | 6 months | 6 months | 6 months | 3 months |
| 203. Drugs and Drug Paraphernalia | 6 months | 6 months | 6 months | 6 months |
| 204. Forgery | 3 months | 3 months | 3 months | 1 month |
| 205. Security Threat Group or Unauthorized Organizational Activity | 6 months | 6 months | 6 months | 3 months |
| 206. Intimidation or Threats | 6 months | 6 months | 6 months | 3 months |
| | | | | |
| 208. Dangerous Communications | 6 months | 6 months | 6 months | 6 months |
| 209. Dangerous Written Material | 6 months | 6 months | 6 months | 6 months |
| 210. Impairment of Surveillance | 6 months | 6 months | 6 months | 3 months |

| | | | | | |
|---|---|---|---|---|---|
| 211. | Possession or Solicitation of Unauthorized Personal Information | 6 months | 6 months | 6 months | 3 months |
| 212. | Frivolous Lawsuit | 0 days | 0 days | 6 months | 0 days |
| 213. | Failure to Reveal Assets | 0 days | 0 days | 6 months | 0 days |
| 214. | Fighting | 6 months | 6 months | 3 months | 3 months |
| 215. | Disobeying a Direct Order Essential to Safety and Security | 6 months | 6 months | 3 months | 3 months |
| | | | | | |
| 302. | Gambling | 3 months | 3 months | 3 months | 0 days |
| 303. | Giving False Information to an Employee | 3 months | 3 months | 3 months | 0 days |
| 304. | Insolence | 3 months | 3 months | 3 months | 0 days |
| 305. | Theft | 6 months | 6 months | 3 months | 0 days |
| 306. | Transfer of Funds | 3 months | 3 months | 3 months | 0 days |
| 307. | Unauthorized Movement | 3 months | 3 months | 1 month | 0 days |
| 308. | Contraband or Unauthorized Property | 6 months | 6 months | 3 months | 0 days |
| 309. | Petitions, Postings, and Business Ventures | 3 months | 3 months | 1 month | 0 days |
| 310. | Abuse of Privileges | 3 months | 3 months | 3 months | 0 days |
| 311. | Failure to Submit to Medical or Forensic Tests | 3 months | 3 months | 3 months | 0 days |
| 312. | Possession of Money | 3 months | 3 months | 3 months | 0 days |
| 313. | Disobeying a Direct Order | 6 months | 6 months | 6 months | 0 days |
| 402. | Health, Smoking, or Safety Violations | 3 months | 3 months | 1 month | 0 days |
| | | | | | |
| 404. | Violation of Rules | 1 month | 1 month | 1 month | 0 days |
| 405. | Failure to Report | 1 month | 1 month | 1 month | 0 days |
| 406. | Trading or Trafficking | 2 months | 2 months | 1 month | 0 days |
| 501. | Violation of State or Federal Laws | 1 year | 1 year | 1 year | 1 year |
| 601. | Aiding and Abetting, Attempt, Solicitation, or Conspiracy | Same as underlying offense | Same as underlying offense | Same as underlying offense | ½ as underlying offense |

**No. 1-17-1739**

| | |
|---|---|
| **Cite as:** | *People v. Hill*, 2020 IL App (1st) 171739 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 95-CR-6668(01); the Hon. Dennis J. Porter, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |

21