2020 IL App (2d) 160823-B
No. 2-16-0823
Opinion filed December 29, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 93-CF-795 |
| SEAN R. HELGESEN, | ) ) | Honorable George J. Bakalis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    In 1995, following a jury trial, defendant, Sean R. Helgesen, was found guilty of 10 counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 1992)) for stabbing and slashing Peter and Diana Robles to death on April 17, 1993, when defendant was 17 years old. Defendant was initially sentenced to natural life in prison, pursuant to section 5-8-1(a)(1)(c) of the Unified Code of Corrections, which then mandated a natural life sentence for individuals found guilty of murdering more than one victim. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1992). Following the United States Supreme Court's holding in *Miller v. Alabama*, 567 U.S. 460 (2012), forbidding sentencing schemes that mandate life in prison without the possibility of parole for juvenile offenders, and our supreme court's decision in *People v. Davis*, 2014 IL 115595, ¶ 42, applying *Miller*

retroactively, the trial court granted defendant's successive postconviction petition and held a new sentencing hearing in 2015. Defendant was resentenced to serve two concurrent 90-year prison terms.

¶ 2    Defendant appealed his new sentence, arguing that the maximum term authorized by the sentencing statute is 60 years and, alternatively, that his concurrent 90-year sentences are unconstitutional. We affirmed, holding that defendant's 90-year sentences amounted to extended-term sentences, which were justified by the uncontroverted presence of an extended-term factor (Diana's physical handicap). *People v. Helgesen*, 2018 IL App (2d) 160823-U. Defendant filed a petition for leave to appeal to our supreme court, which was denied with a supervisory order directing us to vacate our prior judgment and reconsider the issue in light of new authority. *People v. Helgesen*, No. 124549 (Ill. Mar. 25, 2020) (supervisory order).

¶ 3    For the reasons that follow, we affirm defendant's 90-year concurrent sentences.

¶ 4                                I. BACKGROUND

¶ 5    Detailed facts concerning the procedural history of this case were set forth in our prior order, and we will not repeat them here. *People v. Helgesen*, 2018 IL App (2d) 160823-U, ¶¶ 6-24. We will, however, provide a brief factual summary for context. A week before the victims' murders, the victims' son, Eric Robles, approached defendant and asked if he was interested in receiving a "large" amount of cash. Eric offered defendant $700 to kill his parents. That week, Eric gave defendant the key to his parents' home, a .22 magnum handgun with three bullets, a collapsible buck knife, and $100 as a down payment. Eric insisted that the murders take place that Friday night. However, defendant spent that evening away from home and did not travel to the Robles' home. Eric called defendant's home several times and eventually spoke to defendant at approximately midnight.

¶ 6    On Saturday morning, defendant's father found the handgun (which defendant told him a friend had asked him to clean) and removed it from defendant's possession. Defendant spent his day at baseball practice and hanging out with friends. That evening, he attended a party hosted by one of Eric's friends. Eric was present and told defendant that "it" had to be done that night. Defendant attempted to create several excuses about why that evening would not work, but he ultimately left the party with Eric at approximately 10 p.m. At defendant's suggestion, he and Eric stopped by a local grocery store to procure nylons, to wear over their faces to obscure their identities, and duct tape, which was placed over the car's license plate and on the boots defendant was wearing.

¶ 7    When they arrived at the Robles' split-level home, Eric opened the door and pushed defendant in and down a set of stairs into a den area, where Peter was watching television. Eric and defendant cornered Peter in the den's washroom, where defendant stabbed and slashed Peter 22 times in the face, neck, chest, and arms. Peter's collarbone, left orbital plate, and skull were fractured, his carotid artery and jugular vein were slashed, and his cervical spinal column was severed. Peter died at the scene.

¶ 8    Seemingly alarmed by the noise emanating from the lower level of her home, Diana (who was physically handicapped from a childhood polio illness) got out of bed and, using her crutches, made it to the main level of the house, where she was confronted by her son and defendant. Eric pinned his mother down, and defendant stabbed and slashed Diana 29 times in the face, neck, chest, and arms; 11 of her wounds were defensive wounds. Diana's heart was pierced twice, her face was slashed open, and she suffered from several skull fractures. Diana did not die immediately. When police arrived at the Robleses' home, Diana was grasping at her neck. She was taken to a nearby hospital, where she later died from her wounds.

¶ 9    Defendant and Eric were later found by police outside a nearby high school. Defendant confessed to stabbing the victims "two or three times" and participated in a videotaped walkthrough of the scene of the crime, wherein he described the killings.

¶ 10    After defendant was found guilty of the 10 counts, the trial court (Judge John J. Nelligan) sentenced him to natural life in prison, identifying the murders as "one of the most gruesome and grisly murders in this town, or perhaps, anywhere." The court stressed that "[t]he viciousness that was employed by this defendant is really incomprehensible, *** the results of this defendant's actions leaving two innocent unsuspecting people literally *** looking like raw bloody chopped meat, *** all for the promise of a few hundred dollars." The court also stated that defendant, given the brutal and heinous nature of the crime and his lack of remorse, "is deserving of the most severe punishment available under the law."

¶ 11    At the 2015 resentencing hearing, the State presented evidence outlining the facts established above, the 1995 presentence investigative report, an updated (2015) presentence investigative report, testimony from the assistant state's attorney assigned to prosecute the case, defendant's disciplinary records while incarcerated at the Illinois Department of Corrections (DOC), and two victim impact statements—one from Diana's brother and one from Diana and Peter's son Jason. Defense counsel presented testimony from defendant's parents and three DOC staff members as to his conduct while in custody, evidence of the various certificates he has earned while incarcerated, and defendant's statement to the court.

¶ 12    After hearing the evidence presented and argument from counsel, the trial court (Judge Bakalis) issued a 14-page sentencing memorandum opinion and resentenced defendant to 100 years. The memorandum opinion enumerated the *Miller* factors, focusing in great detail on the

circumstances of the crime and defendant's potential for rehabilitation. In concluding, the court stated:

"The most damaging factor for [defendant] is his willingness to participate in the crimes, even if done reluctantly, and the fact that he was the one who actually stabbed the victims, all with some assistance from [Eric], and the nature of the stabbings. This in and of itself could justify this courts [*sic*] resentencing the defendant to mandatory life. To do so however would be to ignore the Supreme Court's admonitions regarding juvenile sentencing. The court therefore must consider the maturity level of [defendant] at the time of these offenses, his lack of self-esteem and vulnerability to pressure from Eric *** as contributing factors in this crime. Perhaps most importantly the court has considered defendant's rehabilitate [*sic*] potential as shown by his prison experience. The court can only conclude that [defendant] at this point in his life is not the individual that he was at the age of 17. The court believes that if released at some point in time [defendant] will not pose a danger to others. The court therefore concludes that some modification of defendant's sentence is warranted. The nature of the defendant's involvement in these crimes, however, must also be factored into any modification.

* * *

The seriousness of defendant's crime, the murder of Peter and Diana Robles, weigh heavily into the court's consideration. It was a crime, although not planned by the defendant, [that] could have been easily avoided by him. *** The court believes that even though defendant was a juvenile at the time of the offense, given the nature of the crime, a significant jail sentence is appropriate."

The court echoed its memorandum opinion on the record:

"In making a determination in this case, the Court has considered the United States Supreme Court cases regarding the sentencing of juveniles and the requirement of considering any possible rehabilitative potential it may have. In this regard, the Court has taken into consideration the defendant's personality and background at the time he committed these crimes as applicable to any rehabilitative potential. The Court has considered his conduct while in the Department of Corrections over the last 23 years, as it may be applicable to rehabilitative potential. ***

Finally, the Court has considered and placed a great deal of weight upon the defendant's active participation in this crime, the nature of the crime, the brutality of the crime, and the fact that in the Court's mind that it was an easily avoidable crime. These people did not have to be murdered if proper steps had been taken."

¶ 13 Defense counsel filed a motion to reconsider the sentence, arguing that the trial court emphasized Eric's sentence too much in resentencing defendant. In granting the motion to reconsider, the court stated:

"In my mind, in this case the overriding consideration in my mind was the offense itself, seriousness of the offense, the nature of the offense. [Defendant] was paid a minimal amount, I think, but technically compensated to commit these murders. One of the individuals murdered was a handicapped polio victim. [Defendant] in my mind had numerous opportunities to not have to do these things, and he didn't do that. I understand that he was a juvenile. He was 17. He wasn't 13 or 14. He was close to adulthood. These are all factors. And the overwhelming consideration, again, is the nature of this crime, the double murder and the manner in which it was committed.

Now, I've reviewed my opinion. I've reviewed these cases in terms of life

expectancy with the Department of Corrections and so forth. I think [Defendant] in the years that he's been in the Department of Corrections has shown some rehabilitative protentional. So I have to weigh that against this very, very seriousness of the crime that he committed here.

* * *

I know it's a severe sentence. It's a very severe crime. And that's my justification. It's not a life sentence."

Defendant was subsequently sentenced to two 90-year sentences, to be served concurrently.

¶ 14    Defendant appealed, arguing that the maximum term authorized by the statute is 60 years and, in the alternative, that the 90-year sentences were unconstitutional. We rejected those arguments and affirmed defendant's sentences. *Helgesen*, 2018 IL App (2d) 160823-U, ¶ 4. Defendant filed a petition for leave to appeal to the supreme court, which was denied with a supervisory order directing us to vacate our prior judgment and consider the effect of *People v. Holman*, 2017 IL 120655, and *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the eighth amendment and directing us to determine if a different result is warranted. *Helgesen*, No. 124549. We allowed the parties to file supplemental briefing on the issue.

¶ 15                                    II. ANALYSIS

¶ 16    The eighth amendment to the federal constitution prohibits cruel and unusual punishment. U.S. Const., amend. VIII. Inherent in that prohibition is the concept of proportionality. *Graham v. Florida*, 560 U.S. 48, 59 (2010). Criminal punishment should be graduated and proportioned to both the offender and the offense; when a serious offense has been committed by a juvenile, "there is a genuine risk of disproportionate punishment." *Holman*, 2017 IL 120655, ¶ 33. Children are

considered "constitutionally different from adults for purposes of sentencing" (*Miller*, 567 U.S. at 471), and the case law on sentencing juveniles who have committed serious offenses has necessarily evolved in recognition of this fact.

¶ 17    The United States Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578 (2005)), life sentences for juveniles who commit nonhomicide offenses (*Graham*, 560 U.S. at 74), and mandatory life sentences for juveniles who commit murder (*Miller*, 567 U.S. at 489). In so holding, the Court in *Miller* noted that sentencing courts were required "to take into account the differences among defendants and crimes." *Id.* at 480 n.8. Our supreme court has subsequently determined that the holding in *Miller* is retroactive (*Davis*, 2014 IL 115595, ¶ 42), applies to mandatory *de facto* life sentences for juveniles (*People v. Reyes*, 2016 IL 119271, ¶ 9), and applies to discretionary sentences of life without parole for juveniles (*Holman*, 2017 IL 120655, ¶ 40).

¶ 18    Sentencing courts are not foreclosed from the possibility of sentencing a juvenile to a life sentence, either natural or *de facto*, but may do so only if "the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. Although no "magic words" are required when making such a determination (*People v. Hill*, 2020 IL App (1st) 171739, ¶ 50), the court must consider as mitigating circumstances the juvenile offender's age and age-related characteristics as well as the nature of his crimes (*Holman*, 2017 120655, ¶ 46). Those characteristics, initially identified in *Miller*, include (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial

or peer pressures that might have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Id.*

¶ 19    In *Buffer*, our supreme court drew a bright line of 40 years' imprisonment constituting a *de facto* life sentence. 2019 IL 122327, ¶ 40. The court further noted, "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27. In revisiting a juvenile defendant's life sentence, the only evidence that matters is the evidence of the defendant's youth and its attendant characteristics at the time of sentencing; no one factor is dispositive. *People v. Lusby*, 2020 IL 124046, ¶ 35. "[W]e review the proceedings to ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible and a life sentence was appropriate." *Id.*

¶ 20    There is no dispute that defendant's 90-year concurrent sentences constitute *de facto* life imprisonment, using the guidance the supreme court provided in *Buffer*. (Even taking the potential day-for-day credit defendant would receive because he was convicted and sentenced before truth in sentencing, the 90-year sentences would amount to a term of 45 years.) Therefore, the only question before us is whether the trial court properly considered defendant's youth and its attendant characteristics in imposing the sentences. We hold that it did.

¶ 21    Unlike other cases that were also remanded for reconsideration after our supreme court's decision in *Buffer*, here, in making its findings during defendant's 2015 resentencing, the trial court did not merely state that it considered the *Miller* factors; it specifically enumerated and weighed them. See *People v. Cavazos*, 2020 IL App (2d) 120171-B, ¶ 23 (reversing a *de facto* life sentence

for juvenile offender when the trial court's sentence predated *Miller* and thus the court was unable to consider the juvenile offender's youth and attendant characteristics); see also *People v. Walls*, 2020 IL App (2d) 130761-B, ¶ 82 (reversing a *de facto* life sentence for a juvenile offender when the trial court did not explicitly consider the *Miller* factors). Although the court did not make an express finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (as *Holman* was decided two years after defendant's resentencing hearing), our review of the record, especially the court's thoughtful 14-page sentencing memorandum opinion and stated reasons on the record, demonstrates that defendant's *crime* reflects " 'irreparable corruption,' " rather than " 'unfortunate yet transient immaturity.' " *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573).

¶ 22    The trial court heard testimony from several witnesses and received evidence from the State in aggravation and from defendant in mitigation. Using the established evidence, the court made the following findings regarding the *Miller* factors. First, the court stated that it considered that defendant was a juvenile, age 17, when he murdered Peter and Diana Robles. The court specifically noted, "[t]he court concludes that defendant was somewhat immature for his age and was probably vulnerable to being intimidated by [Eric]. Defendant, however, was not so immature as to not recognize or appreciate the risks inherent in his conduct as evidence [*sic*] by his statement regarding his attempt to put off or not participate in the murders."

¶ 23    Regarding the second *Miller* factor, the trial court noted that defendant had a "supportive family particularly after beginning to reside with his father and step-mother [at age 8] of whom he felt very highly." The court also noted that, given his supportive family background, "it is difficult to understand why, if defendant feared for his life if he did not comply with Eric['s] *** demands, he did no[t] approach family members for assistance."

¶ 24    As to the third *Miller* factor, the trial court noted that Eric sought defendant out to commit the crimes and it found that defendant was "reluctant to carry out the acts requested by [Eric] but is culpable because he took no actions to either inform other adults of the plan or to request assistance nor simply refuse to accompany [Eric] on the night in question." The court found that both Eric and defendant were equally culpable for the murders.

¶ 25    The court noted that there was no evidence regarding the fourth *Miller* factor, that the defendant was unable to deal with police officers or prosecutors or was incapable of assisting his own attorneys.

¶ 26    Finally, with respect to the fifth *Miller* factor, the trial court recognized that *Miller* "stressed that juveniles have the greater capacity for change and reformation. A juvenile's character generally has not been fully developed *so that one cannot conclude that they are beyond rehabilitation*. This is why a mandatory life sentence for juveniles without a full sentencing hearing has been struck down." (Emphasis added.) The court's rationale must be judged by the lens through which it was written, namely without the guidance of *Holman* and *Buffer*, which (1) established the requirement of finding permanent incorrigibility in sentencing juvenile defendants to life and (2) drew a bright line at 40 years for a life sentence.

¶ 27    In sentencing defendant to concurrent 90-year sentences, the trial court recognized that subjecting juvenile defendants to such a harsh penalty would be uncommon. It also noted that defendant had been a well-behaved prisoner while in the DOC, holding responsible jobs, and that he furthered his education by obtaining a general equivalency diploma and certificates. The court then stated that it could "only conclude that [defendant] at this point in life is not the individual that he was at the age of 17. The court believes that if released at some point in time [defendant] will not pose a danger to others." The court concluded, however, "that even though defendant was

a juvenile at the time of the offense, given the nature of the crime, a significant jail sentence is appropriate."

¶ 28    In his supplemental brief, defendant cites *People v. Murphy*, 2019 IL App (4th) 170646, for the proposition that an express finding by the trial court that defendant had rehabilitative potential "served to contravene and vitiate any claims of compliance with *Miller*." Defendant thus argues that, because the trial court stated that defendant has shown a potential for rehabilitation, he cannot be sentenced to any more than 40 years' imprisonment. Indeed, we recently cited *Murphy* for such a proposition, in *Walls*: "Under the law as it presently stands, if the court believed that defendant had rehabilitative potential, it could not sentence him to a prison term exceeding 40 years." *Walls*, 2020 IL App (2d) 140761-B, ¶ 85. In response, the State submits that *Holman* did not require that sentencing courts find a total lack of rehabilitative potential before imposing a life sentence, arguing that the supreme court in *Holman* merely reiterated the trial court's findings that the defendant was "beyond rehabilitation." The State argues that such a requirement "seems to defeat the existence of any sentence between 40 years and actual natural life." In light of the ever-evolving case law on the topic of sentencing juvenile offenders, the State's point is well taken.

¶ 29    The case at hand is a prime example of the problem with a one-size-fits-all mandatory sentencing scheme for juveniles, which we note was what the Supreme Court took issue with in *Graham*, *Roper*, and *Miller*. Here, the court weighed the *Miller* factors appropriately and made an "informed decision based on the totality of the circumstances that the defendant was incorrigible and a life sentence was appropriate." *Lusby*, 2020 IL 124046, ¶ 35. Defendant was physically much larger than both victims. He stabbed and slashed two victims, one of whom was physically handicapped, over 20 times each, so much so that their bodies looked like "chopped meat," and all for $100. Defendant was not a passive observer or an accomplice to the crime. *Contra Miller*, 567

U.S. at 478 (juvenile offender's conviction based on an aiding-and-abetting theory). Defendant did not grow up in a life of crime or with negative influences encouraging him to commit acts of violence. *Contra Walls*, 2020 IL App (2d) 130761-B, ¶ 87 (juvenile offender's background resembled a Charles Dickens tragedy). The crime was not impulsive, as he had over a week to remove himself from the situation and had several opportunities to ask for help from family and friends, with whom he had good relationships. *Contra People v. Luna*, 2020 IL App (2d) 121216-B, ¶ 30 (juvenile offender's crime was consistent with impulsive and immature behavior). The only mitigating factor came into play well after defendant had been incarcerated for most of his life. The court's hypothetical statement that, "if at some point in time" defendant were to be released, he would not pose a danger to others is not an express recognition of his rehabilitation potential but rather reflects that the court properly engaged in weighing all of the necessary factors.

¶ 30    To apply *Murphy*'s holding here would be to tie a sentencing court's hands with respect to what it found appropriate for a juvenile offender: either that at the time of sentencing, and in light of the heinous facts before it, the court finds that a defendant is not beyond rehabilitation (and thus cannot be incarcerated for more than 40 years) or that he is beyond rehabilitation (and thus should remain incarcerated forever). That is not something we will do with respect to defendant. We reiterate that the reasoning behind *Miller* was to provide each juvenile offender with a proportionate sentence, taking into account the differences among defendants and crimes. Each juvenile offender is different. Each case's facts are different. Each juvenile offender should be given an individualized sentence. Here, the court did just that. To hold otherwise would fly in the face of rationality and contradict our supreme court's own words that, in fashioning these sentences, "[n]o single factor is dispositive." *Lusby*, 2020 IL 124046, ¶ 35.

¶ 31                                III. CONCLUSION

¶ 32    For the reasons stated, we affirm defendant's concurrent 90-year sentences.

¶ 33    Affirmed.

---

**No. 2-16-0823**

---

| | |
|---|---|
| **Cite as:** | *People v. Helgesen*, 2020 IL App (2d) 160823-B |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 93-CF-795; the Hon. George J. Bakalis, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Christopher Cronson and Brett Cronson, of Cronson & Cronson, Ltd., of Waukegan, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, of counsel), for the People. |

---