2021 IL App (1st) 182401

No. 1-18-2401

Opinion filed May 25, 2021

SECOND DIVISON

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 96 CR 6048 |
| | ) | |
| JAIME RUIZ, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, the 17-year-old defendant, Jamie Ruiz, was convicted of murder and attempted murder and sentenced to concurrent terms of 30 years and mandatory natural life imprisonment. See 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 1996). By operation of law, this sentence was ordered to be served consecutively with a separate 30-year sentence imposed for the defendant's prior and unrelated 1994 murder conviction (No. 94-CR-24440). See *id.* § 5-8-4(h). After the defendant's conviction and sentence were affirmed on appeal, he sought review of his mandatory natural life sentence by means of postconviction proceedings, arguing, *inter alia*, that it was unconstitutional as applied to him under *Miller v. Alabama*, 567 U.S. 460 (2012). By

agreement of the parties, the defendant's sentence was eventually vacated, and the cause was remanded to the trial court for resentencing.

¶ 2    On remand, the defendant, who was now 40 years old, was resentenced to 50 years on the murder charge and 30 years on the attempted murder conviction to be served concurrently. Again, by operation of law, these sentences were ordered to run consecutively to the defendant's prior 30-year sentence in case No. 94-CR-24440. See 730 ILCS 5/5-8-4(h) (West 1996).

¶ 3    On appeal, the defendant challenges the constitutionality of the newly imposed 50-year sentence. In this respect, he makes three contentions. First, he argues that the 50-year sentence is a *de facto* life sentence and therefore unconstitutional as applied to him both under the federal and state constitutions (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11). Specifically, he argues that in imposing this sentence, the trial court failed to find that he was permanently incorrigible and, in fact, stated on the record that it did not intend to impose either a natural or *de facto* life sentence. Nonetheless, in determining what constitutes *de facto* life, the trial court then improperly relied on day-for-day good-time credit to find that 50 years is not *de facto* life. Second, on appeal, the defendant contends that because by operation of law the newly imposed 50-year sentence must be served consecutively with his prior 30-year sentence in case No. 94-CR-24440, the aggregate mandatory sentence of 80 years' imprisonment is itself a *de facto* life sentence and therefore unconstitutional as applied to him both under the United States and Illinois Constitutions (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11). Third, the defendant contends that his right to due process was violated during the resentencing hearing, when the trial court failed to admonish him that he could elect to be resentenced under either the law at the time the offenses were committed (1996) or the law at the time of resentencing (2018). Alternatively, the defendant contends that his counsel was ineffective for not urging him to elect to be sentenced under the

2018 law. For the following reasons, we vacate the defendant's sentence and reverse and remand for a new sentencing hearing with instructions.

¶ 4                                    I. BACKGROUND

¶ 5      Because the 15-year procedural history of this case is complex and lengthy, we set forth only those facts relevant to the resolution of this appeal.

¶ 6                                    A. Undisputed Facts

¶ 7      It is undisputed that while still a juvenile, the defendant, who was an active member of the Latin Kings, participated in two separate murders, for which he was charged and convicted. In the first occurrence (case No. 94-CR-24440), the defendant was found guilty by accountability of the 1994 murder of Daniel Martinez and sentenced to 30 years' imprisonment on July 12, 1996. In that case, the evidence at trial established that, on August 25, 1994, the then 16-year-old defendant was with other Latin King members in rival Two-Six gang territory looking for enemy gang members when he passed the victim, Martinez, and heard Martinez comment to a friend not to "hang out on the streets looking for trouble, but to make something out of his life." The defendant approached Martinez and asked him why he had "disrespected his love?" When Martinez indicated he did not want any trouble and tried to walk away, the defendant punched him and called his fellow gang members to join in. The victim tried to run down an alley but was caught by the defendant and his fellow gang members and beaten. At that point, another Latin King member pulled out a handgun and shot the victim in the head and neck. At trial, the defendant was identified as a "Cocina," or a second-in-command in one of the Latin Kings' pee wee groups, and the shooter was identified as the "Inca," or the leader.

¶ 8      While out on bond and awaiting trial in that case, on February 7, 1996, the defendant committed the instant crime (case No. 96-CR-6048). Specifically, the defendant, who was now 17

years old, went into enemy Two-Six gang territory, followed, and then shot two victims (Julio Rodriguez and Joel Rodriguez), believing they were rival gang members. One of the victims died from his gunshot wounds. Because the details of the 1996 case are set forth in detail in this court's decision on direct appeal in *People v. Ruiz*, No. 1-99-1372 (2000) (unpublished order under Illinois Supreme Court Rule 23), we need not repeat them here. After the jury found the defendant guilty of murder and attempted murder, on March 3, 1999, the defendant was sentenced to mandatory natural life imprisonment on the murder conviction and a concurrent sentence of 30 years' imprisonment on the attempted murder charge. See 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 1996). In addition, because the defendant committed the instant crime while he was out on bond on the first murder charge, the sentence in the instant case was required to be served consecutively with the 30-year sentence already imposed in case No. 94-CR-24440. See *id.* § 5-8-4(h).

¶ 9                                              B. Procedural History

¶ 10      After the defendant unsuccessfully appealed his conviction and sentence, for the next decade, he pursued numerous claims on collateral review. Relevant to this appeal, on July 10, 2013, he sought leave to file his third successive postconviction petition asserting that his natural life sentence was unconstitutional under *Miller*, 567 U.S. 460. After the defendant was granted leave to proceed with his successive petition, that petition was advanced to the second stage of postconviction proceedings, and the defendant was appointed counsel. The case was then continued for years until the United States Supreme Court denied the State's writ of *certiorari* in *People v. Davis*, 2014 IL 115595, *cert. denied*, 574 U.S. 1026 (2014), which had held that *Miller* applied retroactively on collateral review. At this point, the State conceded that *Miller* required that the defendant be granted a new sentencing hearing. Accordingly, on November 30, 2017, by agreement of the parties, the trial court vacated the defendant's sentence of natural life

imprisonment and remanded the case for a new sentencing hearing.

¶ 11    At the time of remand, the defendant was 40 years old and had already been in prison for over 23 years.

¶ 12                    C. The Defendant's Sentencing Memorandum

¶ 13    Prior to the resentencing hearing, defense counsel filed a sentencing memorandum asking that the defendant be resentenced to 30 years' imprisonment on his murder charge. In support, the memorandum attached 43 exhibits, including, *inter alia*, (1) a June 8, 2018, report from Chicagoland gang expert Professor John Hagedorn opining about the defendant's rehabilitative potential and his present maturity; (2) certificates from numerous programs that the defendant had completed while incarcerated; (3) the Illinois Department Of Correction (IDOC)'s visitor logs from 1999 to the present showing more than 940 visits to the defendant by family and friends; (4) letters from numerous family members and friends demonstrating the violence, instability, and volatility of the defendant's childhood, the defendant's current efforts at rehabilitation, and the family's intention of providing the defendant with housing and stable work once he was released from prison; (5) a Chicago Tribune article from 1990 discussing the gang violence in the defendant's neighborhood; and (6) a 1994 police report from the murder of the defendant's uncle, Roberto Torres (Roberto), who was savagely beaten to death in an alleyway when the defendant was a teenager. Citing these numerous exhibits, the memorandum argued that all five of the *Miller* factors counseled in favor of a reduced sentence.

¶ 14                        D. Resentencing Hearing

¶ 15    The resentencing hearing was held on September 26, 2018. Prior to any arguments, the trial court asked the parties to clarify the defendant's potential "exposure" under the law. The State indicated that under the 1996 law, the defendant was eligible for a sentence between 20 and 60

years but that he was also "extendable" by virtue of having committed a same-class crime less than 10 years before the instant murder. Accordingly, the State argued, the defendant's sentence could be extended from 60 to 100 years and even to natural life. See 730 ILCS 5/5-8-2 (West 1996). After the subsequent instruction conference, which was held off the record, the trial court stated that it had spoken to the attorneys and that "everybody underst[ood] the potential sentence [the defendant was] facing at this hearing, including that he could be sentenced to a discretionary life sentence. It would not be mandatory, but discretionary."

¶ 16    The parties then proceeded with brief opening arguments. Defense counsel sought the imposition of a 30-year sentence for the defendant's murder conviction. The State, on the other hand, argued that the court should use its discretion to sentence the defendant to a term "commensurate with the seriousness of the offense." In addition, the State asked the court to keep in mind that under the 1996 law, any sentence it imposed was eligible for good-time served day-for-day credit. See 730 ILCS 5/3-6-3 (West 1994).[1]

---

[1] We note that both during the resentencing hearing and on appeal, the parties continue to refer to good-time served day-for-day credit as applicable under the "1996 law" (*i.e*., the year that the petitioner committed the instant crime). We further note, however, that technically this language is to be found in the 1994 version of the statute, which allowed good-time served day-for-day credit for any sentence imposed. See 730 ILCS 5/3-6-3 (West 1994) ("the prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed."). In 1995, however, the legislature amended this section, by removing day-for-day credit for any sentence imposed, except natural life, including a murder sentence. See Pub. Act. 89-404 (eff. Aug. 20, 1995). Therefore, at the time of the petitioner's original 1996 sentencing hearing, truth-in-sentencing would already have been in place, and he would not have been eligible for good-time served day-for-day credit. See 730 ILCS 5/3-6-3 (West 1996). Nonetheless, three years after that original sentencing hearing, our supreme court invalidated the truth-in-sentencing amendments because the act under which they were passed—Pub. Act. 89-404 (eff. 20, 1995)--violated the single subject clause of the Illinois constitution. See *People v. Reedy*, 186 Ill. 2d 1 (1999). The legislature then deleted and recodified the entire truth-in-sentencing legislation originating from Pub. Act. 89-404, and the new truth-in-sentencing amendments became effective on June 19, 1998. See Pub. Act. 90-592 (eff. June 19, 1998). The new recodification, however, did nothing to cure the unconstitutionality of Pub. Act. 89-404. See *Reedy*, 186 Ill. 2d at 17-18. Therefore, under our supreme court's precedent, at the time of the petitioner's resentencing hearing, under the "1996 law" the petitioner was eligible for good-time served day-for-day sentencing credit.

¶ 17    The parties next presented their evidence. In mitigation, the defendant offered his 43 exhibits and the testimony of the following five witnesses: (1) his sister Maria Carmen Ruiz (Ruiz); (2) his cousin Jacqueline Ibarra (Ibarra); (3) his daughter Perla Karina Ruiz (Perla); (4) his girlfriend Sonia Garcia; and (5) retained Chicagoland gang expert, Professor Hagedorn. For purposes of brevity, we summarize the evidence that was adduced in mitigation.

¶ 18    It is undisputed that the defendant is the youngest of four children of Mexican immigrants with three older sisters. The defendant's sister, Ruiz, and his cousin, Ibarra, both testified that as a child, the defendant suffered severe medical complications, requiring him to wear a colostomy bag, which he found embarrassing and which impeded his ability to connect with his peers. In addition, both Ruiz and Ibarra averred that the defendant grew up in an unstable environment. According to Ruiz, while their mother was "very kind" and overprotective, their father was an abusive alcoholic, who was often physically violent with their mother. As Ruiz explained, the family went through "a lot of emotional abuse at home," and the children were all afraid of him. Ibarra similarly testified that "anything would trigger [him] to go physical on my aunt," and as children "we *** just comforted each other." In her letter, admitted into evidence, the defendant's second sister, Elvira Vergara, similarly described their childhood, noting that while their mother worked multiple jobs to support the family, their father was a violent alcoholic and was either drunk, violent, or absent from the home. As a result, the defendant had no relationship with his father.

¶ 19    The neighborhood of Little Village, where the defendant grew up, was also violent and replete with gangs and drugs. The defendant's uncle, Roberto, was killed by gangs in April 1994 when the defendant was only a teenager. Ibarra testified that Roberto was savagely beaten to death in an alley and left to die, but that the family never discussed his death because violence was

considered "normal." She believed that this made it even more difficult for the young defendant to cope.

¶ 20    The evidence at the hearing further established that the defendant's three older sisters moved out of the home in their teens, leaving the defendant unsupervised and unsupported. According to a letter from the defendant's childhood acquaintance, Luz Maria Cervantes, as a young teen the defendant was expected to "financially contribute[ ] to the household to make do." As Ibarra explained, at 16, the family considered the children to be adults and expected them to contribute just as they had done when they were growing up in Mexico. As was common in the neighborhood, the defendant dropped out of school at 15. Ibarra explained that the highest level of education in their family was fifth or sixth grade, and "at 16, we didn't think about options, about school or anything of that nature."

¶ 21    Ruiz and Ibarra next testified that they both had a good relationship with the defendant when he was younger. Ibarra averred that, as a child, the defendant was very calm and respectable, just "a normal kid who wanted to be part of a family." He often came to Ibarra's house and hung out with her and her boyfriend playing video games. Ruiz and Ibarra both stated that it was not until all three of his sisters left home that the defendant began hanging out with "the wrong crowd" and changed. According to Ibarra, when he was in around eighth grade the defendant began to distance himself from the family and to hang out with his own peers. At this point he became very confused, angry, and rebellious. He made friends with a boy from the neighborhood who was in a gang and, eventually, led by this boy, joined the gang himself.

¶ 22    Ibarra and Ruiz both believed that if the defendant had had a positive male role model, he would not have joined the gang or committed either crime. Both believed that the crimes were the result of his immaturity and gang involvement. Letters from family friends, Cervantes, and Elena

Rangel similarly stated that the defendant's actions were a result of his adolescent rebellion.

¶ 23    Ruiz further explained that after the defendant's arrest on the first murder charge in 1994, their mother attempted to help him, but that the defendant was too young to be able to help himself. Ruiz testified that after their mother paid the bond for the defendant's release, she also found the defendant a job and encouraged him to "get his life on track." However, at that point, the defendant's then-girlfriend, who idolized his gang lifestyle, became pregnant. Feeling overwhelmed and depressed, the defendant continued to hang out with the "wrong crowd," which led to his commission of the instant crime.

¶ 24    Ruiz and Ibarra both testified that they have supported the defendant throughout his incarceration and that he has greatly matured since the time he was a teenager. The defendant's present girlfriend, Garcia, similarly testified that the defendant has grown and matured since the time of his offenses, reflected upon his past mistakes, and changed his entire way of thinking. According to Garcia, since 2004, when she met him, the defendant has made incredible changes in his life and is respectful, inquisitive, and deeply caring for his family. She also stated that she would not be in a relationship with him if she believed that he was still actively involved in the Latin Kings. The defendant's daughter, Perla, who was born while the defendant was in jail, similarly testified that the defendant is a loving and devoted father and grandfather, who has become "one of her best friends." Perla averred that the defendant encourages her to stay out of trouble and that she knows he is a good person who does not want to return to "where he used to be."

¶ 25    Numerous family members and friends similarly attested to the defendant's involvement and positive influence in their lives since his incarceration. Fellow prisoner Miguel Brito Jr. credited the defendant with his years of continued education, explaining that the defendant had

insisted that he sign up for the General Educational Development (GED) classes and continued to encourage him, giving him information "on schools that provide[d] courses to offenders through mail so [that Brito] could enroll." Similarly, childhood friend, Miguel A. Saucedo wrote that based on the defendant's advice to "stay in school, stay out of trouble, don't join[ ] gangs, and go to college," he escaped their neighborhood and pursued higher education, including a doctoral degree. The defendant's nephew Francisco Franco Jr. and niece Lilliana Vergara similarly credited their accomplishments to their uncle's encouragement. As Franco wrote, his uncle not only encouraged him to go to college but also "took it upon himself to read articles in magazines and papers on what industries needed people to hire and what industries paid good."

¶ 26    In addition, the evidence introduced at the hearing established that during his incarceration, the defendant had completed numerous classes and workshops, including, *inter alia*, "Inside/Out Dad," "BURST," "How to Succeed on the Streets," "ADAPT," "Crossroads Bible Institute," and chess classes. Throughout his incarceration, the defendant also consistently attended chapel, practiced his Catholic faith, and regularly corresponded with Father Arturo J. Perez, who stated in his letter that he believed the defendant now recognized the consequences of his actions and had tried to better himself to the benefit of his family.

¶ 27    Finally, the defendant's family offered evidence regarding the defendant's plans upon release from prison. Both Ibarra and Ruiz testified that the defendant had no intention of returning to Little Village and would instead live with one of them in their homes, either in Burbank or Oswego. Ibarra further testified that she would never invite the defendant into her home if she believed that he was violent, especially since her two younger children still live at home. She further stated that her husband, Jose Ibarra (Jose), who is a foreman in a construction company has offered to provide the defendant a job and to teach him the trade. Jose's letter to the court

acknowledged the same.

¶ 28    In addition to the aforementioned evidence, at the sentencing hearing, Chicagoland gang expert, Professor Hagedorn, testified in detail about the defendant's rehabilitative potential. He acknowledged that in his June 8, 2018, written report, he had concluded that the defendant does not fall into the category of irretrievably depraved or permanently incorrigible juveniles, which deserve prolonged and continued incarceration. Professor Hagedorn explained that in coming to this conclusion, he considered his three interviews with the defendant, letters provided by the defendant's family members, his own research into Chicago gangs, transcripts and police reports from the defendant's crimes, and incident reports from the Cook County jail and IDOC.

¶ 29    Professor Hagedorn first testified that the 10th District neighborhood of Little Village, where the defendant grew up, had been Latin King territory since the 1960s and was the dividing line between two other rival gangs, the Two Sixers, and the Satan Disciples. According to Professor Hagedorn, the 1990s, when the defendant was a teenager, were the most violent period in Chicago's history of gang wars. Because of the demise of the gang coalitions, in that decade, the Latin Kings were at war with numerous other gangs in the neighborhood, including the Latin Folks, the Two Sixers, the Latin Disciples, and the Satan Disciples. The mentality of the gang was different from previous decades when the gang was more of a social or community organization. This was a time of war and serious violence, and new gang members were expected to be soldiers, defending the Latin King's turf and seeking out enemies to fight.

¶ 30    The defendant joined the Latin Kings in 1992 when he was 14 years old and remained an active member until his incarceration in 1996. According to Professor Hagedorn, during that time, the defendant was one of four or five "shorties," or junior Latin King members, in the local Trumbull Avenue Latin King branch. The professor explained that such pee wee members were

not officially considered members of the Latin King Nation by the older members and would not have a structured hierarchy. Therefore, according to Professor Hagedorn, while the record of the defendant's 1994 trial states that he was "second in command" of the local pee wee group, this does not reflect how these groups were organized at the time and it is inordinately unlikely that a 16-year-old, like the defendant, would have been named a "Cacique," or second-in-command.

¶ 31 Professor Hagedorn next explained how the defendant became involved with gangs. He stated that, as a young boy, the defendant was initially drawn to sports and did not see the gang in his future. Around the fourth grade, however, he began having trouble in school and got a reputation as a "troublemaker." From then on, Professor Hagedorn explained, the defendant was "treated as a dunce," made to "stand in the corner," and was embarrassed or shamed as a standard disciplinary tactic. This alienated him from school and made him more susceptible to the bad influences rampant in the neighborhood. It would be another five years, however, before the defendant would succumb to peer pressure and join the Latin Kings following in the footsteps of his best friend, Juan Torres.

¶ 32 According to Professor Hagedorn, the defendant joined the Latin Kings because they were the peer group in the neighborhood, and the only way to not join them would have been to move away—an option the defendant did not have. In addition, the defendant was "young and impressionable," and there were not enough "protective factors" to counter the "pulling factors" for him to escape the gang scene. Specifically, apart from the problems he was already experiencing in school, the defendant had a disruptive family life. The defendant's father was an abusive alcoholic, who was often violent with the defendant's mother, which made the defendant feel "hopeless and guilty." Without any real father-son relationship, the defendant naturally looked up to older gang members as role models who appeared to him to be well respected in the

neighborhood. In addition, the defendant's then girlfriend supported his gang activities and was excited about his "tough-guy" violent street persona.

¶ 33    Professor Hagedorn next described the usual maturation process of gang members. He explained that unlike the defendant, some gang members are indoctrinated into the gang by their families, and therefore have a much harder time identifying with anything outside of the gang. According to Professor Hagedorn, however, the defendant, who was never accepted by the gang as a generations-old-member, has always experienced a conflict of identities: the pull of the gang life and the belonging that it offers versus his more conventional identity, *i.e.*, his religion and the humbleness and hard-working ethic of his mother's family who grew up in a small Mexican village.

¶ 34    Professor Hagedorn next testified about identity replacement and how that allowed a gang member to leave the gang. He explained that distancing from a gang is a process, which involves taking small steps by participating in activities that are not part of the individual's gang identity, which ultimately leads to identity replacement. In Professor Hagedorn's opinion, the defendant was the definition of the distancing process as he has spent the last 11 years of his incarceration avoiding gang activities and trying to better himself. Specifically, the defendant has been involved in numerous prison programs, has become an avid reader, and has learned to get along with former enemies, including a black Gangster Disciple he taught to read. In addition, the defendant has counseled younger inmates from different gangs to use their prison time to do something positive. According to Professor Hagedorn, in taking these steps over time, the defendant's conventional identity has prevailed over his gang identity, and he now sees himself as a family man who wants to get out of prison to a place where "he has no enemies" and away from the Latin Kings.

¶ 35    Consistent with this identity, according to Professor Hagedorn, the defendant has expressed

remorse for his crimes and the senselessness of the violence he committed. Professor Hagedorn strongly denied that the defendant merely regretted being caught. Instead, the defendant expressed remorse for everything his belonging to the Latin Kings had caused him to do, including ruining other people's lives as well as his own. The defendant told Professor Hagedorn that he regretted not staying in school and having thrown away his life, stating: "I caused all that pain and hurt for nothing. How can I tell someone your family died for no reason? For belief in a gang?"

¶ 36    Professor Hagedorn acknowledged that upon entering IDOC, the defendant continued to be a member of the Latin Kings but stated that the defendant's sole reason for continued membership was survival. As the professor explained in his written report, the prison system at first strengthens gang identity because young Latinos entering a black-dominated and gang-laden inmate culture are fearful and their gang represents protection and solidarity. As the defendant himself told the professor, inmates with no gang affiliation are at risk of being raped, robbed, or assaulted. The first time the defendant went into the prison yard, he saw a prisoner "getting slashed." Accordingly, the defendant was greatly relieved when he met a fellow inmate from his old Trumbull Avenue Latin King branch upon first arriving at Menard Correctional Center.

¶ 37    Professor Hagedorn opined that the defendant's IDOC records support the conclusion that the defendant's continued membership in the gang is rooted in survival. Specifically, the professor pointed out that, just as expected, in the first few years of his incarceration the defendant, who would have been only 17 or 18 years old, obtained additional gang tattoos, and received several tickets for insolence and fighting. However, in the next 11 years, spanning from 2000 to 2011, uncharacteristic of what would have been expected of a true Latin King, the defendant was not given a single gang-related ticket and was never found with any drugs, shanks, weapons, or gang literature or propaganda.

¶ 38    While the defendant has not publicly renounced the gang, Professor Hagedorn explained that incarceration itself makes renunciation nearly impossible. Specifically, public denouncement requires a debriefing session with IDOC. This invites violence against the denouncer and threats to family members and loved ones and almost always requires a transfer to another prison or placement into protective custody. Because the defendant's mother still lives in Latin King territory, the defendant feared that she would be in danger if he renounced his gang affiliation. Accordingly, the defendant has been trying to distance himself from the Latin Kings without endangering himself or his family. This has not come without a cost, as under IDOC rules, the defendant's refusal to publicly renounce the Latin Kings has prevented him from obtaining his GED.

¶ 39    Despite his refusal to publicly denounce the Latin Kings, Professor Hagedorn opined that it was very unlikely that, if released, the defendant, who is over 40 years old, would revert to his prior gang activities. As the professor explained, if released, the defendant wants to get back to school, obtain "a decent job," be a part of his daughter's and granddaughter's lives, and work with "troubled kids." In addition, the defendant is adamant that upon release he will not return to Little Village.

¶ 40    Professor Hagedorn further opined that he does not believe the defendant is manipulative, or a hardcore gang member, pretending to be changed to get released and then resume criminality. Instead, the two murders that the defendant committed represent a distant past characterized by the defendant's immaturity and impetuosity. In the professor's opinion, the defendant has matured and the main barrier to further change is his prison environment, rather than an unalterable violent or evil character. Accordingly, with respect to sentencing, Professor Hagedorn recommended "a concrete and not too distant release date."

¶ 41 On cross-examination, Professor Hagedorn acknowledged that IDOC's records reflect that in 2012 the defendant received a ticket for a non-gang related "dangerous disturbance." The professor explained, however, that after this ticket was issued, the defendant, in turn, filed a lawsuit alleging excessive force against his prison guards. The IDOC's Administrative Review Board subsequently found that the allegations against the defendant were unsubstantiated and his record was expunged.

¶ 42 Professor Hagedorn also acknowledged that IDOC's records reflect that, in 2014, the defendant received a security threat group ticket, which the Bureau of Prisons uses to refer to gangs. That ticket was based on information from four confidential informants[2] claiming that the defendant was on the seven-member advisory and disciplinary body of the Latin Kings, called the Crown Council (Council), "at Menard and somewhere else." Professor Hagedorn, however, found these allegations to be flimsy and incredible and likely raised by "snitches" to benefit themselves. He explained that from his years of research, which included conversations with numerous contacts within the Latin Kings, some of whom were high ranking members and had served on the Council, the Council is top secret and no general member of the Latin Kings within any of the prisons would know who its members were. The reason for the secrecy is the Council's power within each Latin King chapter, which includes organizing elections for "Inca" and "Cacique," recruiting new members, expelling others, and even removing the "Inca." Accordingly, unless the confidential informants were also on the Council, which the professor believed was very unlikely,

---

[2]Prior to the sentencing hearing, defense counsel sought information regarding the identities of these four confidential informants with the intent of questioning them and potentially subjecting them to cross-examination at the hearing. However, the trial court granted the Illinois Attorney General's nonparty motion to quash the subpoena seeking the informants' identities. Instead of moving to entirely exclude their allegations, defense counsel chose to have Professor Hagedorn evaluate and testify about them.

they would have no way of knowing whether the defendant was one of the seven Council members. Moreover, according to Professor Hagedorn, the defendant's IDOC records, which lack tickets for gang-related fights, violence, or gang literature after 2000, are inconsistent with what would be expected of a high-ranking Latin King on the Council. As the professor explained, "defendant's lack of fighting to show loyalty to the King Nation would have certainly disqualified him from being on the Crown Council." In addition, Professor Hagedorn found glaring that the prison refused to name the confidential informants or provide any context as to their allegations regarding the defendant's gang activities, apart from the bare allegation that he was on the Council. Professor Hagedorn further noted the suspicious timing of the materialization of these allegations in the wake of the defendant's successful litigation against IDOC. In his report, the professor opined that it was highly unlikely that there were ever any confidential informants and that instead the allegations were concocted by prison staff as retaliation for that lawsuit that the defendant won.

¶ 43    On cross-examination, Professor Hagedorn further acknowledged that according to the Cook County Sherriff's records, the defendant was involved in a jail brawl on January 2, 2018. The professor testified, however, that in his opinion this fight was both "stupid" and not gang related. The professor stated that before making this judgment, he watched the video footage of the fight, read the jail reports, and talked to the defendant. The professor explained that the fight involved something of the highest importance to the defendant, namely his access to the telephone and his ability to stay in touch with his daughter and family. Specifically, the defendant had been moved to a new deck and because there were only three telephones on every deck, as a "newbie" he had to negotiate access to the telephone. When he tried to do so, the defendant was told by the large, "aggressive" inmate who controlled the telephone and who had the reputation of preying on Latino inmates, stealing their commissary and bullying them: "[Y]ou ain't gonna get on that

phone." The defendant told Professor Hagedorn that according to the "inmate code," at that point he had to stand up for himself—if he didn't fight for the telephone "what [would] stop this guy from stabbing me or stealing my shirt [later]?" Accordingly, Professor Hagedorn opined that the incident was not gang motivated but rather partly race-driven and mostly a product of jail conditions. As the professor's report explained:

> "Gang boundaries, even within Cook County Jail, are breaking down, but the elements of survival and need for human contact with family and the outside world remain. Racial tensions are high within the jail with Latinos a distinct and at times vulnerable minority. [The defendant] has been socialized to survive in a prison environment and this brief fight was his statement he would not become a victim and be denied use of the phone. The [Cook County jail] incident report signed by J. Holmes concurs: 'The reason for the incident was over the telephone.' "

¶ 44    After the defense rested, the State presented seven exhibits in aggravation, including (1) certified copies of the defendant's two convictions; (2) the trial transcript and appellate court record in case No. 96-CR-6048; (3) the defendant's presentence investigation reports prepared for case Nos. 96-CR-6048 and 94-CR-24440; (4) a group of reports from the Cook County Sherriff, including the report describing the defendant's 2018 jail altercation over the use of the telephone; (5) a stipulation regarding the undisputed facts in case No. 94-CR-24440; and (6) a victim impact statement provided as part of the original sentencing hearing by the mother of the victim Martinez in case No. 94-CR-24440.

¶ 45    The defendant next gave a lengthy statement in allocution, expressing remorse for the pain he had caused the victim's families and his own family and stating that he would bear that shame for the rest of his life. He regretted his sisters having to carry his responsibilities for his daughter

and his mother. He was sorry for Perla growing up without her father, and he hoped for a chance to be a part of her and her daughter's lives. He also recognized that he contributed to the fear and violence in his neighborhood. The defendant also stated that he had matured and wanted to help other people avoid his fate. He asked the court to see him as the man he was today and provide him with an opportunity to "make amends and pay retribution to society for the wrongs" he had done.

¶ 46    After hearing all the evidence, the trial court sentenced the defendant to a term of 50 years' imprisonment for murder and 30 years' imprisonment for attempted murder to run concurrently. Both sentences were again ordered to be served consecutively with the previously imposed 30-year sentence in case No. 94-CR-24440. The court acknowledged that as such the sentences "obviously [were] stacked for aggregate" but stated that it nonetheless believed it had "crafted a sentence here that was fair to all the parties."

¶ 47    In pronouncing the sentence, the court explicitly stated that the present circumstances did not warrant either a natural life or a *de facto* life sentence. However, the court found that in accounting for what constitutes a *de facto* life sentence, it needed to factor in good-time credit. As the court explained:

> "The *de facto* life essentially states that an individual should not [be] given life if they can't serve that sentence. However, again on this second case he is also eligible for day for day good time credit. *** I'm looking at *de facto* life as to the earliest possibility of release."

¶ 48    The court also noted that it had never encountered a situation where a defendant committed a murder while on bond for another murder. The court mused whether the defendant's crime (the second murder), which it labeled an "execution," was the "depraved individual" described in *Miller*.

¶ 49    The court then went through each of the *Miller* statutory factors. First, it noted the defendant's impetuousness as a young man in a rebellious state with depression. Next, it recognized that the defendant faced pressure from his gang and that his home environment was toxic and abusive. Regarding the rehabilitation evidence, the court stated that it was conflicted. On the one hand, there was a lot of support from family and evidence that the defendant interacted positively with them and had dreams and goals. On the other hand, the defendant had not formally renounced the Latin Kings. The court further stated that the defendant had taken full responsibility for his crimes and had made no excuses in his allocution. The court then noted that the only evidence it saw that the defendant had trouble participating in his defense was his noncooperation with the presentence investigator at his original 1996 sentencing hearing. In addition, the court found that the defendant had no criminal history other than the two murder cases.

¶ 50    At the end of the sentencing hearing, the court instructed the defendant to continue in his rehabilitation efforts, stating:

> "The fact of the matter is, Mr. Ruiz, that your life doesn't end today. And if you're really dedicated to what your family believes you're dedicated to and what you told me, you have a unique opportunity to touch people in your life. You can go and climb into a hole and disassociate yourself from everyone else. You could be active in the gang. Or you could help some young people that you have contact with. I truly believe that you have learned some things since you were 15 and 16 years old, but I would strongly urge you to continue your rehabilitation and your commitment to others, sir."

¶ 51    Following the sentencing hearing, the defendant filed a motion to reconsider arguing, *inter alia*, that because the 50-year sentence imposed had to be served consecutively to the 30-year sentence for the 1994 murder, the sentence was a *de facto* life sentence and therefore

unconstitutional as applied to him.

¶ 52    The trial court denied the defendant's motion. With respect to the defendant's *de facto* life argument, the court stated:

"I think I did address the *de facto* life issue and how I did not feel it was *de facto* life because, number one, it applies to the potential release date, what his age would be at the potential release date. And [two,] these are two separate occurrences and not one occurrence. There's two separate homicides. One committed after he was on bond for the first murder. So the question is whether or not it would even apply on the—on separate cases. But I don't believe that my sentence is, in fact, *de facto* life based on the fact that he is entitled to day-for -day good time credit if he does qualify for the day for day good time credit. And I believe he will be out of custody when he's what 6[5]?"

The defendant now appeals.

¶ 53                                    II. ANALYSIS

¶ 54    On appeal, the defendant makes three contentions. First, he argues that his 50-year *de facto* life sentence is unconstitutional as applied to him both under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11), where the trial court failed to find that he was permanently incorrigible and improperly relied on day-for-day good-time credit in determining the length of his sentence. Second, the defendant argues that because the 50-year *de facto* life sentence must be served consecutively with his prior 30-year sentence in case No. 94-CR-24440, the aggregate mandatory sentence of 80 years' imprisonment is a *de facto* life sentence and unconstitutional as applied to him both under the United States and Illinois Constitutions. Third, the defendant contends that his right to due process was violated during the resentencing hearing when the trial court failed to

admonish him that he could elect whether to be resentenced under the 1996 or the 2018 law. Alternatively, he contends that his counsel was ineffective for not urging him to elect to be sentenced under the 2018 law, under which he would not have been eligible for a discretionary life sentence.

¶ 55    Because we find this issue to be dispositive, we begin by addressing the defendant's argument regarding the constitutionality of his 50-year *de facto* life sentence.

¶ 56    In this respect, the defendant contends that since he was resentenced in 2018, (1) the Illinois Supreme Court has unequivocally held that a sentence of more than 40 years imprisonment for a juvenile is a *de facto* life sentence (see *People v. Buffer*, 2019 IL 122327, ¶ 41) and (2) our appellate court has repeatedly held that good-time credit is not to be counted when considering whether a sentence amounts to *de facto* life (see, *e.g.*, *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 20; *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 19). The defendant therefore contends that because the resentencing court considered good-time credit in determining whether the imposed 50-year term constituted *de facto* life, that sentence is unconstitutional as applied to him both under the eighth amendment and the Illinois proportionate penalties clause. In addition, the defendant argues that the trial court failed to adequately consider his youth and its attendant characteristics and never found that he was permanently incorrigible to justify the imposition of such a *de facto* life sentence. For the reasons that follow, we agree.

¶ 57    We first address the defendant's arguments in context of the eighth amendment. The eighth amendment of the United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. It prohibits not only "inherently barbaric punishments" but those "disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010).

¶ 58    In *Miller*, the United States Supreme Court held that a sentence of mandatory life without

parole for juveniles "violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 U.S. at 465. The rationale was that minors are constitutionally different from adults for purposes of sentencing, as they are less mature and responsible, more impulsive, and more vulnerable to peer pressure than adults. *Id.* at 471-74. *Miller* did not preclude life sentences for juveniles in all circumstances but rather required only that the trial court first consider the special characteristics of young offenders, such as immaturity, impetuosity, and the failure to appreciate risks and consequences, before imposing such a sentence on them. In other words, the Court's holding required that life-without-parole sentences be based on judicial discretion rather than statutory mandates. See *id.* at 470.

¶ 59    Subsequently, in *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016), the United States Supreme Court determined that *Miller* should apply retroactively and that state courts must apply *Miller* in collateral proceedings. *Montgomery* held that while *Miller* did not prohibit all life sentences for juvenile, such sentences were reserved for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at 208. *Montgomery* explained that *Miller*

> "recognized that a [trial court] might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' " *Id.* (quoting *Miller*, 567 U.S. at 479).

¶ 60    Relying on the aforementioned principles, our supreme court has since extended *Miller* to apply to juvenile offenders who were sentenced to life imprisonment, whether natural or *de facto* (*People v. Reyes*, 2016 IL119271, ¶¶ 9-10), or mandatory or discretionary, and the trial court failed

to consider their youth and attendant characteristics when imposing the sentence. *People v. Holman*, 2017 IL 120655, ¶ 40. In addition, since the defendant's resentencing hearing, our supreme court has unequivocally held that a prison sentence of over 40 years imposed on a juvenile offender constitutes a *de facto* life sentence in violation of the eighth amendment. See *Buffer*, 2019 IL 122327, ¶ 41.

¶ 61    According to our supreme court's present interpretation of *Miller*, a sentencing court may impose a life sentence on a juvenile offender but only after it has considered the defendant's youth and its attendant characteristics and made a finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46; see also *Buffer*, 2019 IL 122327, ¶ 24. In making this determination, our supreme court and subsequently our legislature have instructed the sentencing courts to consider the following non-exhaustive list of youthful characteristics: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46; see also 730 ILCS 5/5-4.5-105(a) (West 2018). Therefore, if a trial court in Illinois wishes to impose a sentence of more than 40 years on a juvenile offender, it must first go through these factors and determine that the defendant is one of the rare juveniles "whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at 208; see *Buffer*, 2019 IL 122327, ¶ 24.

¶ 62    We are cognizant that while this appeal was pending, in *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021), the United States Supreme Court recently reinterpreted *Miller* and *Montgomery* and held that the eighth amendment creates no federal requirement that a trial court find a juvenile offender permanently incorrigible before imposing a life sentence. Nonetheless, in so holding, the Supreme Court also noted that states are free to impose "additional sentencing limits in cases involving defendants under 18" or "require sentencers to make [specific] factual findings before sentencing an offender under 18 to life without parole." *Id.* at ___, 141 S. Ct. at 1323. In fact, the Court held that states are not limited in the procedures they choose to apply in determining when, as well as whether, a juvenile offender can ever be sentenced to life. *Id.* at ___, 141 S. Ct. at 1323. Accordingly, until our supreme court tells us otherwise, and in line with our legislative mandate, we shall follow the procedures that have stemmed from our supreme court's interpretations of *Miller* prior to the issuance of *Jones*. In line with that precedent, we continue to require sentencing courts to consider a juvenile offender's youth and its attendant characteristics and make a finding of permanent incorrigibility prior to imposing a life sentence.

¶ 63    With these principles in mind, we turn to the merits of this appeal.

¶ 64    In the present case, at the outset, the State argues that the defendant was not sentenced to a *de facto* life sentence so as to trigger any *Miller*-based protections and require the trial court to find him permanently incorrigible before sentencing him to life imprisonment. The State asserts that because the defendant was sentenced under the law as it applied in 1996 when the "truth-in-sentencing" statute had not yet been enacted, he is entitled to day-for-day good-time credit served. See 730 ILCS 5/3-6-3(a)(2) (West 1994) ("[T]he prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of

incarceration set by the court."). Accordingly, the State argues that if the defendant "does not misbehave" while incarcerated, he will only be required to serve half of his 50-year sentence. Citing to the IDOC website, the State notes that, with good time served, the defendant's "projected parole date is February 4, 2036," under which he "will have served 39 years, 11 months, and 29 days," a sentence that is under 40 years, and therefore does not constitute *de facto* life under *Buffer*. For the following reasons, we disagree.

¶ 65    Since the decision in *Buffer*, our appellate court has repeatedly held that the availability of statutory good-time sentencing credit "is irrelevant to the determination of whether a [juvenile] defendant has been sentenced to a *de facto* life sentence," *i.e.*, a sentence greater than 40 years' imprisonment. *Thornton*, 2020 IL App (1st) 170677, ¶ 20; see also *Peacock*, 2019 IL App (1st) 170308, ¶ 19, *appeal filed*, No. 125340 (Ill. Oct. 4, 2019); *People v. Figueroa*, 2020 IL App (1st) 172390, ¶ 35; *People v. Daniel*, 2020 IL App (1st) 172267, ¶¶ 23-26; *People v. Quezada*, 2020 IL App (1st) 170532, ¶ 13; *People v. DiCorpo*, 2020 IL App (1st) 172082, ¶ 53.

¶ 66    We first addressed this issue in *Peacock*, in the context of an 80-year sentence imposed on a juvenile offender for murder. *Peacock*, 2019 IL App (1st) 170308, ¶¶ 1-3. In that case, just as here, in light of the holding in *Buffer*, the State argued that because the defendant could be released in 40 years or less with good time served, his sentence was not *de facto* life and the court was not required to find the defendant permanently incorrigible before imposing the 80-year term. *Id.* ¶ 15. We rejected the State's argument, holding that the defendant's sentence was indeed *de facto* life. *Id.* ¶ 17. As we aptly explained:

> "Defendant was not sentenced to 40 years' imprisonment but was instead sentenced to 80 years' imprisonment with the mere possibility of release after 40 years. Moreover, to serve a sentence of 40 years, he must receive every single day of good conduct credit for

which he could be eligible. Defendant's receipt of day-for-day credit is not guaranteed. [Citations.] The IDOC 'has the right to revoke good-conduct credits for disciplinary infractions, [and] an inmate's right to receive the credits is contingent upon his good behavior while in prison.' [Citations.] The IDOC 'ultimately has discretion as to whether defendant will be awarded any credit,' and the trial court has no control over the manner in which a defendant's good conduct credit is earned or lost. [Citation.] Accordingly, we conclude that defendant's 80-year sentence, for which he may receive day-for-day credit, constitutes a *de facto* life sentence." *Id.* ¶ 19.

¶ 67 Subsequently, in *Thornton*, we revisited the issue in the context of a juvenile defendant's postconviction challenge to his 70-year murder sentence. *Thornton*, 2020 IL App (1st) 170677, ¶¶ 20-22. Here again, the State argued that because of good-time credit, the defendant was likely to serve only 35 years and therefore his sentence should be treated as a 35-year term rather than an unconstitutional 70-year *de facto* life sentence. *Id.* ¶ 18. The State also explicitly urged this court to find that *Peacock* had been wrongly decided. *Id.* ¶ 21. Rejecting the State's argument, we reiterated that day-for-day credit is not guaranteed because it is IDOC rather than the trial court that has the ultimate discretion as to whether any such credit will be awarded. *Id.* ¶ 22. We therefore held that "the State's assurances [of good time credit] are not enough for us to consider the defendant's sentence as anything other than a 70-year term." *Id.*

¶ 68 Since *Thornton*, our appellate courts have repeatedly reaffirmed the holding of *Peacock*. See *Figueroa*, 2020 IL App (1st) 172390, ¶ 35 ("we adhere to *Peacock* and *Thornton*"); *Daniel*, 2020 IL App (1st) 172267, ¶¶ 23-26 (applying *Peacock* and *Thornton* to find that a 70-year sentence was *de facto* life, even though defendant was eligible for day-for-day good-conduct credit that could "reduce his time served to 35 years"); *Quezada*, 2020 IL App (1st) 170532, ¶¶ 13, 16

("declin[ing] to depart from our holding in *Peacock*" and holding that a "judicially imposed sentence cannot exceed the bounds of *Buffer*, irrespective of the availability of sentencing credit"); *DiCorpo*, 2020 IL App (1st) 172082, ¶ 54 (listing all the decisions that have reaffirmed *Peacock*); *cf*. *People v. Gavin*, 2021 IL App (1st) 182085, ¶ 54 ("[w]e agree wholeheartedly with the reasoning in *Peacock* and do not depart from it here," but nonetheless distinguish the defendant's situation from the one found in *Peacock* because all the good time credit has already been served and the sentences have been discharged).

¶ 69    Their rationale has always been the same, namely that we may not consider day-for-day credit in calculating what constitutes *de facto* life because day-for-day credit is a function of IDOC and not the judiciary. *Quezada*, 2020 IL App (1st) 170532, ¶ 13. It is axiomatic that "the trial court does not control the manner in which good-conduct credit is earned and lost by a prisoner." *People v. Castano*, 392 Ill. App. 3d 956, 960 (2009); see also *Quezada*, 2020 IL App (1st) 170532, ¶ 16. The Unified Code of Corrections tasks the IDOC, not the trial court, with prescribing the rules and regulations for awarding and revoking sentencing credit. 730 ILCS 5/3-6-3 (West 2018). "The Director of the [IDOC] has the 'sole discretion' to determine whether an inmate receives sentencing credit and in what amount." *Quezada*, 2020 IL App (1st) 170532, ¶ 16 (quoting *Lee v. Godinez*, 2014 IL App (3d) 130677, ¶ 9). Accordingly, were we to adopt the State's position, we would be leaving it up to IDOC to determine "whether defendant serves an unconstitutional *de facto* life sentence." *Id.* Instead, by holding that "the judicially imposed sentence cannot exceed the bounds of *Buffer*, irrespective of the availability of sentencing credit," we take the matter out of IDOC's hands and ensure that a juvenile offender "does not serve a sentence that is incompatible

with our supreme court's pronouncements in *Buffer*." *Id.*[3]

¶ 70    We agree with the rationale of these decisions and therefore hold that it was improper for the trial court to consider day-for-day credit in determining whether the defendant's 50-year sentence constitutes *de facto* life. Under the clear holding in *Buffer*, the judicially imposed 50-year discretionary term exceeds 40 years and is therefore a *de facto* life sentence.

¶ 71    The State nonetheless asserts that even if we find that the imposed 50-year sentence is *de facto* life, the trial court was well within its discretion to impose such a sentence, where it found that the defendant was permanently incorrigible. For the following reasons, we disagree.

¶ 72    As already noted above, in Illinois "a juvenile defendant may be sentenced to life or *de facto* life imprisonment, but before doing so, the trial court must 'determine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Peacock*, 2019 IL App (1st) 170308, ¶ 22 (quoting *Holman*, 2017 IL 120655, ¶ 46); see also *People v. Hill*, 2020 IL App (1st) 171739, ¶ 46 (for a "*de facto* life sentence, the court must find permanent incorrigibility").

¶ 73    In the present case, the record reveals that the trial court made no such finding. The State correctly points out that at the sentencing hearing, the trial court stated that it understood that even under *Miller* it was permitted to sentence the defendant to a discretionary life sentence and then mused over whether the defendant was one such rare juvenile whose crimes warranted a life sentence. Nonetheless, contrary to the State's position, the record reveals that the court ultimately

---

[3]We note that this exact issue is currently before our supreme court in *People v. Dorsey*, 2017 IL App (1st) 151124-U, *appeal allowed*, No. 123010 (Ill. Mar. 25, 2020). In that case, prior to our supreme court's decision in *Buffer*, in an unpublished order, the appellate court held that good-time credit may be considered in calculating whether a sentence constitutes *de facto* life. Until our supreme court decides *Dorsey*, or rules otherwise, we continue to abide by the overwhelming precedent of our appellate courts.

found the defendant was not deserving of life imprisonment or even *de facto* life. At both at the resentencing hearing and the hearing on the defendant's motion to reconsider, the trial court repeatedly and unequivocally stated that it did not intend to sentence the defendant to either natural or *de facto* life, and that it did not believe that the 50-year sentence it imposed constituted *de facto* life. Instead, intending to fashion a term-of-years sentence (based on the availability of day-for-day good-time credit, which would result in the defendant's release at age 65), the trial court went through each of the *Miller* factors and ultimately acknowledged that the defendant had "learned some things since he was 15 and 16" and that he should "continue [his] rehabilitation and [his] commitment to others."

¶ 74    Although the State is correct that, when making a finding of incorrigibility, the sentencing court need not recite "magic words" (see *People v. Perez*, 2020 IL App (1st) 153629-B, ¶ 56 (Pierce, J., concurring in part and dissenting in part)), almost every finding that the trial court made here rejects the conclusion that the defendant is one of the rare juvenile offenders who deserves a *de facto* life sentence.

¶ 75    As noted above, prior to making a finding of incorrigibility, the trial court was required to and did consider the defendant's youth and its attendant characteristics, including, but not limited to the following factors: (1) the defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the defendant's family and home environment; (3) the defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the defendant's prospects for rehabilitation. *Holman*, 2017 IL 120655, ¶ 46; see also 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 76 Specifically, the trial court found that the defendant had been depressed, rebellious, and subject to physical limitations as a child. The defendant's father was an abusive alcoholic and not present enough to be a role model. With respect to rehabilitation, the court noted that while it was bothered by the fact that the defendant refused to openly renounce the Latin Kings, the defendant did have a strong family support system, goals, and a place to live with a job waiting for him upon release. Moreover, the court found relevant that the defendant had made no excuses and had accepted responsibility for his actions and invited the defendant "who had learned some things" since he was a teenager to "continue his rehabilitation and commitment to others." Furthermore, with respect to the defendant's prior criminal history, the court found that aside from the two murder cases that had landed him in prison for life, the defendant had no other criminal record. In discussing other non-*Miller* mitigating factors, the court also stated that it believed that there was a strong probability that "this would not recur" and that the defendant's character and attitude indicated that he was "unlikely to commit another crime."

¶ 77 Under this record, and taking into account that "the trial court's sentence of *de facto* life *** is in [clear] conflict with its determination that a life sentence was not warranted," we conclude that the sentence is unconstitutional under the eighth amendment as applied to the defendant. *DiCorpo*, 2020 IL App (1st) 172082, ¶ 54; see also *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 48 (holding that the trial court's "determination that [the] defendant, a juvenile, had the potential to rehabilitate contravenes any conclusion that defendant was permanently incorrigible or irretrievably depraved and is, therefore, unconstitutionally at odds with a *de facto* life sentence without parole"). We therefore vacate the defendant's sentence and remand the case for a new sentencing hearing. See *Peacock*, 2019 IL App (1st) 170308, ¶ 25.

¶ 78 Because we find that defendant's sentence constitutes a *de facto* life sentence under *Buffer*

and cannot stand based on the considerations at his resentencing hearing, we need not address the remainder of the defendant's arguments on appeal.

¶ 79    On remand, however, we instruct the trial court to take into consideration that the new sentence will necessarily be served consecutively with the 30-year sentence imposed in case No. 94-CR-24440. Any aggregate sentence, regardless of whether it is imposed for a single or separate crime, which by operation of law exceeds *de facto* life as defined by *Buffer*, is unconstitutional unless it is also made in tandem with a finding that the defendant is beyond rehabilitation. See *Reyes*, 2016 IL 119271, ¶ 9 ("A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation."); see also *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132 (Wyo. 2014) ("[T]he teachings of the *Roper*/*Graham*/*Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability and greater prospects for reform' when, as here, the aggregate sentences result in the functional equivalent of life without parole. To do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile 'die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate.' [Citation.] Such a lengthy sentence ' "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days." ' [Citation.]

That is exactly the result that *Miller* held was unconstitutional. [Citation.]" (Emphasis in original.)).

¶ 80                                III. CONCLUSION

¶ 81    For the aforementioned reasons, we vacate the defendant's sentence and remand for a new sentencing hearing with instructions.

¶ 82    Sentence vacated; cause remanded.

---

**No. 1-18-2401**

---

| | |
|---|---|
| **Cite as:** | *People v. Ruiz*, 2021 IL App (1st) 182401 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 96-CR-6048; the Hon. Charles P. Burns, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Levi S. Harris, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |

---